

**FILED**

2023 Jul-14  PM 06:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

| **Received** | **Filed** |
|---|---|
| 07/15/21 11:05 am | 07/15/21 |

Agro Holdings LLC, Schuler Investments LLC, A
Partner Other Than the Tax Matters Partner,

     Petitioner

     v.

Commissioner of Internal Revenue

     Respondent

Electronically Filed
Docket No. 14699-21

# Petition

**SERVED 09/13/21**

# UNITED STATES TAX COURT

| | | |
|---|---|---|
| **AGRO HOLDINGS LLC,** | ) | |
| **SCHULER INVESTMENTS LLC,** | ) | |
| **A PARTNER OTHER THAN THE** | ) | |
| **TAX MATTERS PARTNER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **DOCKET NO: _____** |
| | ) | |
| **COMMISSIONER OF INTERNAL** | ) | |
| **REVENUE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## PETITION FOR READJUSTMENT OF PARTNERSHIP ITEMS UNDER CODE SECTION 6226

_____

PETITIONER, SCHULER INVESTMENTS LLC, HEREBY PETITIONS this Court as a Notice Partner of Agro Holdings LLC ("Agro") for the tax period ending December 31, 2016.  Procedurally, this is a Petition under Section 6226(b)[1] for a readjustment of the partnership items set forth in the notice of Final Partnership Administrative Adjustment dated February 17, 2021, ("FPAA"), pertaining to Agro's 2016 Form 1065 (U.S. Return of Partnership Income).

_____

[1] Unless otherwise specifically stated, all uses of the terms "Section," "Sections," or "I.R.C." in this Petition refer to the Internal Revenue Code of 1986, as amended, and all uses of the terms "Treasury Regulation," "Treasury Regulations," or "Treas. Reg. §" in this Petition refer to the Treasury Regulations thereunder.

Substantively, this Petition involves the decision by Agro's partners to contribute a fee simple interest in real property to a Land Trust.  On its December 31, 2016 Form 1065, Agro reported a $41,000,000 non-cash charitable deduction related to the fee simple contribution. Upon examination, the IRS concluded that the value of the fee simple donation was $0 based, in part, on an IRS appraisal.[2]  In stark contrast, the $41,000,000 non-cash charitable deduction reported by Agro was based on the analysis of (1) a qualified mining engineer, (2) a second qualified mining engineer who reviewed the first mining engineer's analysis for reasonableness, (3) a qualified appraiser with 35 years of experience, and (4) a second appraiser.

1.     The Petitioner, Schuler Investments LLC, is a Georgia Limited Liability Company having its principal place of business at 1266 West Paces Ferry Rd, #183, Atlanta, Georgia, 30327.

2.     Agro's current mailing address is 4355 Cobb Parkway, Suite J555, Atlanta, Georgia 30339 and its principal place of business is Alabama.

3.     Agro is an Alabama limited liability company.

4.     Agro is a partnership for federal tax purposes.

5.     Agro's taxpayer identification number is set forth in the Statement of Taxpayer Identification Number, which is attached to this Petition.

---

[2] 886-A at 44.

6.     Petitioner owned 24.2525 percent, of the profit, loss, and capital of Agro on December 31, 2016.

7.     Petitioner is a Notice Partner as defined in former Section 6231(a)(8).

8.     Petitioner is filing this Petition within the 150-day period set forth in Section 6226(b) in its capacity as a Notice Partner of Agro.

9.     The Small Business and Self-Employed Division of the Internal Revenue Service located in Phoenix, Arizona issued an FPAA relating to the Partnership's 2016 taxable year on February 17, 2021, a copy of which is attached hereto as Exhibit A and which has been redacted pursuant to Tax Court Rule 27.

10.    Respondent made the following adjustments in the FPAA:

   a.     Disallowance of the $41,000,000 portion of the non-cash charitable contribution deduction pursuant to Section 170(h), from the full reported deduction of $41,005,000.

   b.     Application of 40 percent understatement penalty pursuant to Section 6662(h).

   c.     As alternatives to the 40 percent penalty:

      i.     A 20 percent understatement penalty, whereby the penalty applies to the product of the adjustment amount and highest income tax rate in effect during the tax year pursuant to Section 6662A,

3

ii.   A 20 percent understatement penalty pursuant to Section 6662(c), (d), or (e).

11.   Petitioner disputes all proposed adjustments in the FPAA.

12.   Respondent erred in his determinations reflected in the FPAA for the following reasons:

a.   The donation of the fee simple interest satisfied the requirements of Section 170.

b.   The fair market value of the fee simple interest at the time of donation is not less than $41,000,000.

c.   Respondent erred in asserting penalties based on, alternatively, gross valuation misstatement pursuant to Section 6662(h), a reportable transaction understatement pursuant to Section 6662A, negligence or disregard of rules and regulations pursuant to Section 6662(c), substantial understatement of income tax pursuant to Section 6662(d), or substantial valuation misstatement pursuant to Section 6662(e); and

d.   Respondent erred in asserting that Agro and its partners failed to exercise reasonable cause or establish other defenses to the alleged penalties.

13.    Based on information and belief, the facts, and mixed points of fact and law, upon which Petitioner relies include, but are not limited to, the following:

**<u>General</u>**

a.    Agro was a partnership for federal tax purposes on December 31, 2016.

b.    Petitioner owned 24.2525 percent of the profit, loss, and capital of Agro on December 31, 2016.

c.    Ornstein-Schuler LLC owned 0.01 percent of the profit, loss, and capital of Agro on December 31, 2016.

d.    Workout LLC owned 48.505 percent of the profit, loss, and capital of Agro on December 31, 2016.

e.    New Rapids Land LLC owned 24.2525 of the profit, loss, and capital of Agro on December 31, 2016.

f.    Turtle Bluff LLC owned 1.98 percent of the profit, loss, and capital of Agro on December 31, 2016.

g.    The Estate of Fayne E. Coley and Sherian Kiser each owned 0.5 percent, for a combined total of one percent, of the profit, loss, and capital of Agro on December 31, 2016.

h.    Agro meets the net worth criteria described in Section 7430(c)(4)(A)(ii).

5

**Property Background**

i.    As of November 17, 2016, Agro owned approximately 144.48 acres of real property located in Cherokee County, Alabama (the "Property").

j.    Agro acquired the Property as a capital contribution by Statutory Warranty Deed dated November 9, 2016.

k.    The Property is treated as long-term capital gain property pursuant to Sections 723 and 1223(2).

l.    The Property is located in an area with significant limestone reserves.

m.    The bedrock beneath the Property is part of the Conasauga Formation.

n.    The Conasauga Formation in northern Alabama consists of a sequence of interbedded shale and limestone.

**Title & Mining Due Diligence**

o.    Agro, recognizing the potential of developing the Property as a limestone mine, undertook certain diligence to evaluate the feasibility of doing so.

p.    Agro hired a professional land surveyor licensed in Alabama to prepare a survey of the Property (the "Survey").

q.   Agro hired an Alabama law firm specializing in real estate law to prepare a title report on the Property (the "Title Report").

r.   According to the Title Report, dated December 21, 2016, Agro owned the surface estate of the Property, as well as the mineral estate.

s.   The Title Report goes back to 1851, the year that a patent was issued to William F. Owens.

t.   Agro hired a national firm with over 25 years of experience in geotechnical, construction materials, environmental and facilities engineering (the "Geotechnical Engineer"), to explore the bedrock conditions, and determine and evaluate the feasibility of developing the Property as a limestone quarry.

u.   As a part of the engagement, the Geotechnical Engineer (i) reviewed the local geology, (ii) conducted a borehole drilling program to explore the subsurface bedrock conditions, (iii) obtained laboratory testing on rock core samples from the boring to evaluate pertinent engineering properties, and (iv) prepared a report titled "Report of Geotechnical Exploration & Rock Core Testing," which presents the field and laboratory data obtained during the engagement (the "Geotechnical Report").

7

v.  The Geotechnical Engineer visited the Property with a drilling rig from August 9, 2016 to August 10, 2016 and from August 15, 2016 to August 17, 2016.

w.  During the visits, the Geotechnical Engineer drilled core samples to depths of 90 and 122 feet below the surface to explore the subsurface bedrock conditions.

x.  The Geotechnical Report concludes that there was 7 feet of overburden (brown clayey sand), and 115 feet of limestone at boring location C-5.

y.  The Geotechnical Report concludes that there was 90 feet of limestone at boring location C-4, and no overburden.

z.  The limestone core samples were cataloged and photographed.

aa. The Geotechnical Engineer worked with a professional engineering company that performs laboratory soil tests to evaluate the chemical composition and engineering properties of the rock core samples.

ab. The laboratory was certified by the Georgia Department of Transportation and the American Association of State Highway and Transportation Officials. The laboratory subjected the limestone core samples to the following laboratory tests, in ten-

foot sections:  (i) Standard Test Method for Insoluble Residue in Carbonate Aggregates; (ii) Standard Test Method for the Resistance to Degradation of Large-Size Coarse Aggregate by Abrasion and Impact in the Los Angeles Machine "LA Abrasion"); (iii) Standard Test Methods for Specific Gravity of Soil Solids by Water Pycnometer; (iv) Standard Test Method for Measurement of Hydraulic Conductivity of Saturated Porous Materials Using a Flexible Wall Permeameter (Method D, Constant Rate of Flow); and (v) Standard Test Method for Soundness of Aggregate by Use of Sodium Sulfate or Magnesium Sulfate.

ac.    The results of the laboratory testing are presented in the Geotechnical Report.

ad.    Agro hired a professional mining engineering firm (the "Mining Engineer"), to analyze the Geotechnical Report and determine the feasibility for operating a limestone quarry on the Property.

ae.    The Mining Engineer possessed the following qualifications: (i) Master of Science degree in Mining Engineering; (ii) Master of Business Administration degree; (iii)  Licensed as a Registered Professional Engineer in 11 states, including Alabama; (iv)

9

Registered Founding Member of the Society for Mining, Metallurgy and Exploration; and (v) Licensed Member of the National Society for Professional Engineers.

af.    In 2016, the Mining Engineer possessed over 35 years of mining engineering experience and assisted mine operators with setting up and obtaining permits for over 100 mines nationwide, including 10 in Alabama.

ag.    The Mining Engineer prepared a report titled "Technical Due Diligence Business Plan" for the Property (the "Mining Business Plan").

ah.    The Mining Business Plan concludes that the Property contains Proven Mineral Reserves of approximately 10.863 million tons of lime rock.

ai.    The Mining Business Plan concludes that the limestone from the core samples met or exceeded the standards set out by the Alabama, Georgia, and Tennessee Departments of Transportation for use in all coarse aggregate applications and met the specifications and requirements for general construction applications.

aj.     The Mining Business Plan concludes that there were no local zoning restrictions that would limit the development of a limestone quarry on the Property.

ak.     The Mining Business Plan concludes that it was reasonably probable that a mining operation on the Property could obtain all necessary Alabama permits for a limestone quarry within six to twelve months.

al.     The Mining Business Plan concludes that developing and operating a limestone quarry on the Property was "viable and its success highly probable in the given market."

am.     The Mining Business Plan projects a net present value ("NPV") of approximately $42.228 million for a limestone quarry on the Property.

an.     Agro hired a second Registered Professional Engineer to review the Mining Business Plan and prepare a "Desktop Review of Technical Due Diligence Business Plan" (the "Desktop Review").

ao.     The Desktop Review concludes that the Mining Business Plan uses sound engineering judgement and state-of-the-art mining

11

industry software to determine the technical and business feasibility of operating a limestone quarry on the Property.

ap.    The Desktop Review concludes that the reserve calculations presented in the Mining Business Plan were accurate and complete.

aq.    The Desktop Review concludes that there are no zoning restrictions that would limit the ability to mine the Property, and there are no material issues that would impact permitting the Property.

ar.    The Desktop Review concludes that the price assumed in the Mining Business Plan was below the price of surrounding operations, was reasonable, and would allow for significant market penetration.

as.    The Desktop Review concludes that the high quality of the limestone increases the viability of developing a limestone quarry on the Property.

at.    The Desktop Review concludes that a NPV of $42.228 million is reasonable based on the assumptions, data, and analysis provided in the Mining Business Plan.

**<u>Donation of Fee Simple Interest</u>**

au.    On November 18, 2016, Agro donated the fee simple interest in the Property ("Fee Simple Interest") via Warranty Deed to Atlantic Coast Conservancy Properties, LLC ("ACC Properties").

av.    The Warranty Deed was recorded with the Probate Court Judge of Cherokee County, Alabama on November 21, 2016.

aw.    ACC Properties is a disregarded entity of Atlantic Coast Conservancy.

ax.    ACC Properties was a "qualified organization" for purposes of Section 170 and the Treasury Regulations thereunder as of November 18, 2016.

ay.    ACC Properties was an "eligible donee" for purposes of Section 170 and the Treasury Regulations thereunder as of November 18, 2016.

az.    The Property was not subject to a mortgage as of November 18, 2016.

ba.    Agro did not contribute the Fee Simple Interest to ACC Properties in a bargain sale.

bb.    Agro did not receive any consideration from ACC Properties in exchange for donating the Fee Simple Interest.

bc.    Agro did not receive any consideration from any other party in exchange for donating the Fee Simple Interest to ACC Properties.

**Contemporaneous Written Acknowledgement of Fee Simple Interest**

bd.    ACC Properties provided a letter to Agro, dated November 18, 2016, acknowledging receipt of the donation of the Fee Simple Interest (the "Fee Simple Donation Acknowledgment Letter").

be.    The Fee Simple Donation Acknowledgment Letter confirms that ACC Properties did not provide any goods or services in exchange for the donation of the Fee Simple Interest.

bf.    The Fee Simple Donation Acknowledgment Letter constitutes a "contemporaneous written acknowledgement" for purposes of Section 170 and the Treasury Regulations thereunder.

bg.    On January 25, 2017, ACC Properties provided a second letter to Agro acknowledging receipt of two checks totaling $10,000 dated November 21, 2016 and December 12, 2016, as a donation of stewardship funds ("Fee Simple Cash Donation Acknowledgment Letter").

14

bh.    The Fee Simple Cash Donation Acknowledgment Letter confirms that ACC Properties did not provide any goods or services in exchange for the donation of the cash endowment.

bi.    The Fee Simple Cash Donation Acknowledgment Letter constitutes a "contemporaneous written acknowledgement" for purposes of Section 170 and the Treasury Regulations thereunder.

### Qualified Appraiser for Fee Simple Interest Donation

bj.    A qualified, licensed, MAI appraiser with over 35 years of experience appraising land (the "Appraiser") prepared an "Appraisal Report" dated April 14, 2017 (the "Fee Simple Appraisal") to determine the FMV of the Fee Simple Interest donated to ACC Properties.

bk.    The Appraiser was not a direct partner of Agro.

bl.    The Appraiser was not an indirect partner of Agro.

bm.    The Appraiser did not claim, report, or otherwise take a deduction under Section 170 or any other tax provision for the donation of the Fee Simple Interest.

bn.    The Appraiser was not a party to the transaction in which Agro acquired the Fee Simple Interest in the Property.

bo.    The Appraiser was not the donee of the Fee Simple Interest.

bp.    The Appraiser was not an employee of (i) Agro, (ii) a direct partner of Agro, (iii) an indirect partner of Agro, (iv) a party to the transaction in which Agro acquired the Property, (v) ACC Properties, or (vi) Petitioner.

bq.    The Appraiser was not "related" under Section 267(b) to any of the persons described immediately above.

br.    The Appraiser performed a majority of his appraisals in 2016 for parties other than Agro.

bs.    The Appraiser was a "qualified appraiser," as defined by Section 170 and the Treasury Regulations thereunder.

### Qualified Appraisal for Fee Simple Interest Donation

bt.    The Fee Simple Appraisal is dated April 14, 2017.

bu.    The Appraiser dated the Fee Simple Appraisal before the extended deadline for Agro to file its 2016 Form 1065 on which it claimed the charitable deduction related to the donation of the Fee Simple Interest.

bv.    The Appraiser signed and dated the Fee Simple Appraisal.

bw.    The Fee Simple Appraisal contains a detailed legal description of the Property.

16

bx.   The Fee Simple Appraisal contains a description of the physical condition of the Property.

by.   The Fee Simple Appraisal states that Agro donated the Fee Simple Interest to ACC Properties on November 18, 2016.

bz.   The Fee Simple Appraisal contains the name, address, appraiser certification license number, and social security number of the Appraiser.

ca.   The Fee Simple Appraisal contains the name, address, and taxpayer identification number of the appraisal company.

cb.   The Fee Simple Appraisal contains a list of the qualifications of the Appraiser, including his background, experience, education, and membership in professional associations.

cc.   The Fee Simple Appraisal contains a statement that it was prepared for Agro's potential use regarding the preparation and filing of federal income tax returns.

cd.   The Fee Simple Appraisal states that it was prepared in accordance with USPAP.

ce.   The Fee Simple Appraisal provides the basis for the conclusions by the Appraiser regarding the FMV of the Fee Simple Interest.

cf.    The Fee Simple Appraisal indicates that the Appraiser based the FMV of the Fee Simple Interest on market conditions as of November 18, 2016.

cg.    The Fee Simple Appraisal concludes that the highest and best use ("HBU") for the Property, before the donation of the Fee Simple Interest, was limestone mining (the "Before-Donation-HBU").

ch.    The Fee Simple Appraisal concludes that the Before-Donation-HBU was legally permissible.

ci.    The Fee Simple Appraisal concludes that the Before-Donation-HBU was physically possible.

cj.    The Fee Simple Appraisal concludes that the Before-Donation-HBU was financially feasible.

ck.    The Fee Simple Appraisal concludes that the Before-Donation-HBU was maximally productive.

cl.    The Fee Simple Appraisal concludes that the FMV of the Fee Simple Interest in the Property was $41,000,000.

cm.    In determining the FMV of the Fee Simple Interest, the Appraiser considered both the sales-comparison and the income approach.

cn.    To determine the FMV of the Fee Simple Interest under the sales-comparison approach, the Appraiser analyzed five recent sales or

18

listings of properties that detail aggregate or surface mining operations.

co.   Under the sales-comparison approach, the Appraiser determined that the FMV of the Fee Simple Interest was $36,120,000.

cp.   To determine the FMV of the Fee Simple Interest under the income approach, the Appraiser used the discounted cash flow ("DCF") method related to the extraction and sale of the limestone reserves on the Property.

cq.   The DCF method is an acceptable appraisal method for valuing real property that contains a significant amount of underlying mineral reserves.

cr.   Under the income approach, the Appraiser determined that the FMV of the Fee Simple Interest was $42,190,000.

cs.   The Appraiser concluded that the sales-comparison approach was less reliable due to significant differences in the location, physical characteristics, and varying resources of the comparable properties.

ct.   In concluding that FMV of the Fee Simple Interest was $41,000,000, the Appraiser determined that the income approach

was the better indicator of value and gave more weight to that approach.

cu.  The fee charged by the Appraiser for preparation of the Fee Simple Appraisal was not based on a percentage of the appraised value of the Fee Simple Interest.

cv.  The fee charged by the Appraiser for preparation of the Fee Simple Appraisal was not based on a percentage of the amount allowable as a charitable deduction under Section 170.

cw.  The Fee Simple Appraisal was a "qualified appraisal," as defined by Section 170 and the Treasury Regulations thereunder.

## Second Fee Simple Appraisal Report

cx.  Agro engaged a second appraisal firm to value the Fee Simple Interest (the "Second Fee Simple Appraisal Report").

cy.  The Second Fee Simple Appraisal Report was prepared under the appraisal standards set out by the Uniform Standards of Professional Appraisal Practice in place on April 18, 2017.

cz.  The Second Fee Simple Appraisal Report described the Property, the condition of the Property, and included a copy of the Warranty Deed in the addenda.

da.   The Second Fee Simple Appraisal Report included the date of contribution; the name, address and taxpayer identification number of the appraiser; the appraiser's qualifications; and a statement that it was prepared for income tax purposes.

db.   The Second Fee Simple Appraisal Report contains extensive discussion about the method of valuation and the specific basis for such valuation.

dc.   The Second Fee Simple Appraisal Report reported a fair market value for the Fee Simple Interest of $42,240,000.

## **Filings with Respondent**

dd.   Agro timely filed its 2016 Form 1065.

de.   The 2016 Form 1065 reports, among other items, the donation of the Fee Simple Interest to ACC Properties, and the donation of stewardship fees.

df.   Schedules K (Partner's Distributive Share Items) to the 2016 Form 1065 show, among other items, charitable contributions of $41,005,000 related to the donation of the Fee Simple Interest and the cash donations.

dg.   Agro attached the Fee Simple Appraisal to its timely filed 2016 Form 1065.

dh.  Agro maintained all records required with respect to the 2016 Form 1065.

## Form 8283 for Donation of the Fee Simple Interest

di.  Agro attached Form 8283 to its 2016 Form 1065 to report the donation of the Fee Simple to ACC Properties.

dj.  Form 8283 contains all the information required by Treas. Reg. § 1.170A-13(c)(4) with respect to the donation of the Fee Simple.

dk.  Form 8283 reports the FMV of the Fee Simple.

dl.  Form 8283 reports Agro's adjusted basis in the Property.

dm.  Form 8283 reports the manner by which Agro the Property.

dn.  Form 8283 reports the date on which Agro obtained the Property.

do.  Dr. Robert Keller, CEO of ACC Properties, signed and dated the Form 8283 on behalf of ACC Properties.

dp.  The Appraiser signed and dated Form 8283.

dq.  Form 8283 contains the name and taxpayer identification number of Agro.

dr.  Form 8283 contains the name, address, and taxpayer identification number of ACC Properties.

ds.  Form 8283 identifies the date on which ACC Properties received the donation.

22

dt.    Form 8283 indicates that Agro donated the Fee Simple to ACC Properties.

du.    Form 8283 contains the name of the Appraiser.

dv.    Form 8283 contains the name, address, and tax identification number of the appraisal company.

dw.    Form 8283 contains a certification by the Appraiser stating that (i) he performed appraisals on a regular basis, (ii) he was qualified to make appraisals of the type of property being valued, (iii) the fee charged for the appraisal was not based on a percentage of the appraised property value, (iv) he was not one of the persons described in Treas. Reg. § 1.170A-13(c)(5)(iv), (v) he understood that an intentionally false or fraudulent overstatement of the value of the property may subject him to a civil penalty under Section 6701, and (vi) he was not barred from presenting evidence or testimony by the Office of Professional Responsibility.

dx.    The statements by the Appraiser in Form 8283 described immediately above were accurate.

**IRS Notice 2017-10**

dy.    On December 23, 2016, thirty-six days after Agro's donation of the Fee Simple Interest to ACC Properties, Respondent published Notice 2017-10 making the donation a listed transaction

dz.    Consequently, Agro submitted a Form 8886 with its Form 1065 for taxable year ending December 31, 2016, fully disclosing its participation in donation of the Fee Simple Interest.

ea.    The Partnership also mailed a copy of the completed Form 8886 to Respondent's Office of Tax Shelter Analysis at the same time it filed its Form 1065 for taxable year ending December 31, 2016.

**History of the Tax Dispute**

eb.    Agro maintained all records required with respect to the 2016 Form 1065.

ec.    Agro cooperated with Respondent during the audit.

ed.    Agro cooperated with all requests by Respondent for information, documents, meetings, site visits, and interviews during the audit.

ee.    Agro responded to each Information Document Request that Respondent issued to Agro during the audit.

ef.    Respondent never issued a summons to Agro during the audit.

eg.    Representatives of Agro provided a tour of the Property to Respondent during the audit.

### Contents of FPAA

eh.    The FPAA does not describe any specific facts, legal theories, tax theories, or analysis for asserting the adjustment of $41,000,000 to the 2016 Form 1065.

ei.    The FPAA does not describe any specific facts, legal theories, tax theories, or analysis for possible defenses and/or exceptions to penalties asserted.

ej.    Respondent relied only on his own employees in making the determinations set forth in the FPAA.

ek.    Respondent did not rely on any independent environmental, ecological, real estate, scientific, mining, financial, economic, engineering, valuation or other professionals in making the determinations set forth in the FPAA.

### Compliance Efforts

el.    Agro complied with Section 170 and the Treasury Regulations thereunder with respect to the donation of the Fee Simple Interest.

em.  In claiming the charitable deductions related to the donation of the Fee Simple on its 2016 Form 1065, Agro relied on the Survey, Title Report, Geotechnical Report, Mining Business Plan, Desktop Review, Fee Simple Appraisal, Second Fee Simple Appraisal Report, and all sources cited in such documents.

en.  Agro reasonably relied on the Survey, Title Report, Geotechnical Report, Mining Business Plan, Desktop Review, Fee Simple Appraisal, Second Fee Simple Appraisal Report, and all sources cited in such documents.

eo.  Agro reasonably relied on the qualified, independent, informed professionals who prepared the Survey, Title Report, Geotechnical Report, Mining Business Plan, Desktop Review, Fee Simple Appraisal, and the Second Fee Simple Appraisal Report.

14.  The contents of the FPAA, particularly the allegation that the charitable deduction related to the donation of the Fee Simple Interest should be $0 is erroneous, unfair, unreasonable, arbitrary, and capricious.

15.  Respondent issued Notice 2017-10 after Agro made the charitable contributions at issue in this case.  Respondent issued Notice 2017-10 without

adhering to the notice-and-comment procedures under the Administrative Procedure Act, 5 U.S.C. § 551 et seq. Respondent's assertion of penalties under Section 6662A, based on the retroactive application of Notice 2017-10, without the required notice-and-comment procedures is unlawful and "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Further, Respondent's assertion of Code section 6662A penalties based on Notice 2017-10 with retroactive effect after the donation was made violates the U.S. Constitution. As a result, Respondent's assertion of penalties under Section 6662A is invalid.

16. Respondent bears the burden of proof as to all matters.

WHEREFORE, Petitioner requests that the Tax Court:

(i) Determine that the 2016 Form 1065 is accurate as filed;

(ii) Determine that there are no adjustments, penalties, additions to tax, or other amounts with respect to the 2016 Form 1065;

(iii) Determine that imposition of a penalty under Section 6662A is violative of the Administrative Procedure Act;

(iv) If warranted by the evidence at trial, determine that Agro undervalued the Fee Simple Interest and increase the amount of the non-cash charitable donation deduction for 2016 accordingly;

(v) Determine that Respondent has the burden of proof on all issues; and

(vi) Grant such other and further relief that it deems appropriate.

Date:  July 15, 2021                          Respectfully submitted,

Michael Todd Welty
Tax Court Bar No. WM0494
TODD WELTY, P.C.
4279 Roswell Rd NE
Suite 208, #352
Atlanta, Georgia 30342
Telephone:  (404) 301-4791
Facsimile:  (678) 840-3481
E-mail:  todd@toddweltypc.com


Andrew Steigleder
Tax Court Bar No. SA0856
TODD WELTY, P.C.
4279 Roswell Rd NE
Suite 208, #352
Atlanta, Georgia 30342
Telephone:  (404) 793-5402
E-mail:  andy@toddweltypc.com


Kevin Johnson
Tax Court Bar No. JK0059
TODD WELTY, P.C.
4279 Roswell Rd NE
Suite 208, #352
Atlanta, Georgia 30342
Telephone: (404) 835-1601
E-mail:  kevin@toddweltypc.com

Lyle Press
Tax Court Bar No. PL0222
TODD WELTY, P.C.
4279 Roswell Rd NE
Suite 208, #352
Atlanta, Georgia 30342
Telephone:  (404) 301-4791
E-mail:  lyle@toddweltypc.com

Macdonald A. Norman
Tax Court Bar No. NM0188
TODD WELTY, P.C.
4279 Roswell Rd NE
Suite 208, #352
Atlanta, Georgia 30342
Telephone:  (404) 239-2064
E-mail:  mac@toddweltypc.com

COUNSEL FOR PETITIONER

Certified Mail # 7019 1120 0000 6954 3880

**Department of the Treasury**
**Internal Revenue Service**
**Small Business and Self-Employed**
IRS  MS4142: PHX: SME
4041 N CENTRAL AVE, STE 112
PHOENIX, AZ 85012

Date:
**FEB 17 2021**
Person to contact:
Name:          Samuel M. Ely
Employee ID:  1001001022
Phone:          602-636-9256
Hours:          7:00 am - 3:30 pm
Partnership ID number:
▮▮▮▮▮▮
Tax year ended:
201612

TAX MATTERS PARTNER
AGRO HOLDINGS LLC
4355 COBB PARKWAY SUITE J 555
ATLANTA GA 30339-4657

### TMP Notice Of Final Partnership Administrative Adjustment

Dear Tax Matters Partner:

The law requires us to send a Notice of Final Partnership Administrative Adjustment (FPAA) to the partnership named above, for the tax year listed above, and to each partner who is entitled to receive this letter.

We determined that adjustments are necessary to certain partnership items for the partnership and tax year listed above. You are receiving this letter because you were identified as the Tax Matters Partner (TMP) for this tax year. Because we made adjustments to these items on the partnership return, these adjustments will flow to the partners' returns as well. The enclosed schedule of adjustments outlines the changes. We will provide a similar letter to those partners entitled to receive it.

The adjustments to the partnership items on the partnership return may include partnership level determinations on penalties and additions to tax that relate to adjustments to partnership items. Form 870-PT, *Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts*, contains the adjustments to the partnership return.

**What you need to do**

**If you agree with the adjustments and want to bind the non-notice partners**
As the TMP, you can enter into an agreement that binds yourself and non-notice partners to the treatment of the partnership items as shown on the enclosed schedule of adjustments. We will also send you a separate letter as a partner (if you are entitled to one), which you can sign if you only want to agree to your share of the adjustments and not bind the non-notice partners. For this purpose, a non-notice partner is a direct partner with less than a one percent interest in a partnership having more than 100 direct partners. You must add the following statement above the signature blocks on the Form 870-PT:

*The undersigned tax matters partner is signing this offer on behalf of himself (herself or itself) and all other partners whom he (she or it) has the authority to bind; a final agreement resulting from the co-signature of the Commissioner of Internal Revenue will be binding on all such other partners.*

**Letter 1830-F (11-2014)**
Catalog Number 66692C

**EXHIBIT A**

If you want to bind yourself and the non-notice partners to the partnership item adjustments, add the language above and sign and return the enclosed Form 870-PT within 150 days of the date of this letter.

We will send you a separate letter as a partner (if you are entitled to one), which you can sign if you only want to agree to your share of the adjustments and not bind the non-notice partners.

When you sign Form 870-PT to bind the non-notice partners, you are:

- Agreeing to the partnership item adjustments
- Agreeing that the non-notice partners are subject to any partnership level determinations as to penalties, additions to tax, and additional amounts that relate to adjustments to partnership items
- Agreeing that the non-notice partners are subject to additional tax and interest resulting from their share of the adjustments to the partnership return
- Waiving the rights of the non-notice partners to participate in any administrative or judicial proceedings affecting the adjustment of partnership items or partnership level determinations as to penalties, additions to tax, and additional amounts for the tax year in question.

This agreement is binding only if you sign and return Form 870-PT, and we sign on behalf of the Commissioner of the Internal Revenue Service. When we sign the agreement form, the one-year extension of the period of limitations on assessments will begin under Internal Revenue Code Section 6229(f).

Within one year of that agreement date, all impacted non-notice partners will receive a final report as to what adjustments we made to their individual, partnership, or corporate returns with a total due or refund amount, including penalties and interest (if applicable).

Once both parties sign the agreement, non-notice partners can't file a claim to:

- Change the items in question
- Claim a refund or credit based on a readjustment

However, they can file a claim to raise:

- Math errors
- Partner level defenses to partnership level determinations of penalties

**If you don't agree with the adjustments**

As the partnership TMP, if you want to contest the adjustments in court, you must file a petition within 90 days from the date of this letter. During this 90-day period, no other partner can file a petition for judicial review.

You can file your petition for readjustment of partnership items with one of the following courts:

- United States Tax Court
- United States Court of Federal Claims
- District Court of the United States, in the district of the partnership's principal place of business

**Letter 1830-F (11-2014)**
Catalog Number 66692C

**EXHIBIT A**

A petition the TMP files in the first 90 days precludes all other actions and covers all partners still in the proceeding. If the TMP doesn't file a petition by the 90th day from the date we mailed the FPAA, any partner entitled to receive this letter, or any 5 percent group, can petition one of these courts. A "5 percent group" includes any group of partners who together have an interest of five percent or more in profits of the partnership. Five percent groups must file the petition after the 90th day, but on or before the 150th day from the date we mailed the FPAA to the TMP. If more than one petition is filed in Tax Court, the first petition filed will go forward. All other petitions (even those filed earlier in one of the other courts) will be dismissed. If no one files a petition in Tax Court, the first petition filed in one of the other courts will go forward and subsequent petitions will be dismissed. All partners still subject to the partnership proceeding will be parties to the petition that is not dismissed. Petitions filed with the United States Tax Court must be mailed to:

> United States Tax Court
> 400 Second Street, NW
> Washington, DC  20217

When you mail the petition, you must attach a copy of this letter to the petition. The timeframe for filing a petition with the court is fixed by law, and the court can't consider your case if your petition is late.

**If you do nothing**
If neither you, as the TMP, nor any partner file a petition for readjustment in any of the courts listed in this letter, the FPAA becomes final, and we will bill all partners for any additional tax plus interest they may owe under the FPAA. Once final, the treatment of the partnership items of the partnership under the FPAA can't be contested in any refund claim or suit.

You may want to contact a tax advisor to discuss this matter.

If you have questions, you can contact the person listed at the top of this letter. If you write, enclose a copy of this letter and include your telephone number and the most convenient time for us to call if we need additional information.

Thank you for your cooperation.

Sincerely,                              *SME*

*Connie L. Blanford*

Charles P. Rettig
Commissioner
By
Connie L. Blanford
Territory Manager, SAA-Technical Services, Legacy

Enclosures:
Schedule of Adjustments
Form 870-PT

cc: Michael Todd Welty, Esq.
    Armando Gomez

**Letter 1830-F (11-2014)**
Catalog Number 66692C

**EXHIBIT A**

| Form **870-PT**<br>(Rev. 4-2012)<br>For partnership<br>taxable years ending<br>after August 5, 1997 | Department of the Treasury — Internal Revenue Service<br>**Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts** | IN REPLY<br>REFER TO:<br>Samuel M. Ely |
|---|---|---|
| Taxpayer(s) name(s), address and zip code:<br><br>TAX MATTERS PARTNER<br>AGRO HOLDINGS LLC<br>4355 COBB PARKWAY SUITE J 555<br>ATLANTA GA 30339-4657<br><br><br>TIN: | Name of Partnership:<br>AGRO HOLDINGS LLC<br><br><br>EIN: ▮▮▮▮▮▮▮▮<br>Name of Tax Matters Partner:<br>ORNSTEIN-SCHULER LLC,<br>Matthew S. Kaynard, Vice President of Finance and Tax Affairs | Tax Year(s) Ended:<br>201612 |

### Offer of Agreement to Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts & Waiver of Restrictions on Assessment for Partnership Items, Penalties, Additions to Tax, and Additional Amounts

Under the provisions of sections 6224(c) and 7121 of the Internal Revenue Code (IRC), the Commissioner of the Internal Revenue Service and the undersigned taxpayer(s) agree to the determination of partnership items and partnership level determinations as to penalties, additions to tax, and additional amounts that relate to adjustments to partnership items as shown on the attached Schedule of Adjustments.

The undersigned taxpayer(s), in accordance with IRC sections 6224(b) and 6213(d), also waive(s) the restrictions provided by IRC sections 6225(a) and 6213(a) and consent(s) to the assessment and collection of any deficiency attributable to partnership items, penalties, additions to tax, and additional amounts that relate to partnership items, as set forth in the attached Schedule of Adjustments (plus any interest provided by law). IRC Section 6651 late filing penalty applies to any late filed (or non-filed) returns that are required to report the partnership item adjustments.

This agreement is conditional and will not become effective or final until this agreement form is returned to the Commissioner and is signed on his or her behalf. The one-year extension of the period of limitations on assessments under IRC section 6229(f) will not begin to run until the date the Commissioner's representative signs this form on the Commissioner's behalf. If this is a partial agreement, the period of limitations for assessing any tax attributable to the settled items shall be determined as if this agreement had not been entered into.

If this part of this agreement form is signed for the Commissioner, the treatment of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items under this agreement will not be reopened in the absence of fraud, malfeasance, or misrepresentation of fact. In addition, no claim for an adjustment of partnership items, refund or credit based on any change in the treatment of partnership items or partnership level determinations as to penalties, additions to tax, and additional amounts may be filed or prosecuted.

Once the taxpayer signs such a waiver and it is countersigned by the Commissioner, the taxpayer cannot file an Administrative Adjustment Request (AAR) on any partnership items for the related TEFRA entity. This includes partnership items not specifically addressed on the attached Schedule of Adjustments.

| Signature of Taxpayer | Date Signed | Phone Number |
|---|---|---|
| Signature of Taxpayer | Date Signed | Phone Number |
| By (Signature and Title) | Date Signed | Phone Number |

| FOR<br>INTERNAL<br>REVENUE<br>USE ONLY | Date accepted for Commissioner | Signature |
|---|---|---|
| | Office | Title |

Catalog Number 57315A          www.irs.gov          (See Instructions for Signing Agreement)          Form **870-PT** (Rev. 4-2012)

## INSTRUCTIONS FOR SIGNING FORM 870-PT

1. Sign the agreement if you wish to agree to the partnership items *and partnership level determinations as to penalties, additions to tax, and additional amounts,* as shown on the attached Schedule of Adjustments.  The execution and filing of this offer will expedite the adjustment of tax liability.

2. If a JOINT RETURN OF A HUSBAND AND WIFE was filed and both spouses intend to agree, both spouses should sign Form 870-PT.  One spouse may sign as agent for the other if acting under a power of attorney, which, if not previously filed, must accompany this form.  The IRS may accept the signature of only one spouse at its discretion.  However, the agreement will only be binding on the signing spouse.

3. If the taxpayer is a corporation, the agreement should be signed with the corporate name followed by the signature and title of the officer authorized to sign Form 870-PT.

4. Your attorney or agent may sign for you if this action is specifically authorized by a power of attorney, which if not previously filed, must accompany this form.

5. If this offer is signed by a trust, the agreement must be signed with the trust name, followed by the signature and title of the person authorized to sign on behalf of the trust. If the trustee is signing this agreement on behalf of the trust and all beneficiaries, a Form 56 must be signed by the trustee. If an individual beneficiary is signing the agreement to bind themselves to the agreement, no Form 56 is needed.

6. If the partner is an LLC, the agreement should be signed by the manager of the LLC or other authority as authorized by State law. The signature line should show: [Name of LLC], by [Name of Manager], Followed by the title [Manager].

7. For a partner who is a subsidiary corporation in a consolidated group:

   • If the agreement is for a partnership year(s) ending on or before the last day of a consolidated return year beginning before June 28, 2002, the agreement should be signed by a currently authorized officer of the corporation who was the common parent corporation of the consolidated group for the relevant consolidated return year(s).  The common parent corporation signs the agreement in its own name.  The signature and title of a current officer of the common parent corporation, who is authorized to bind the common parent corporation, should be displayed in the signature block. See Treas. Reg. § 1.1502-77A(a).

   • If the agreement is for a partnership year(s) ending on or before the last day of a consolidated return year beginning on or after June 28, 2002, then a currently authorized officer of the subsidiary corporation should sign the agreement and should do so in the name of the subsidiary corporation.  See Treas. Reg. § 1.1502-77(a)(6)(iii). The signature and title of a current officer of the subsidiary corporation, who is authorized to bind the corporation, should be displayed in the signature block. The agreement should also be signed by a currently authorized officer of the corporation who was the common parent corporation of the consolidated group for the relevant consolidated return year(s). The signature and title of a current officer of the common parent corporation, who is authorized to bind the common parent corporation, should also be displayed in the signature block.

8. For a partner who is the common parent corporation of a consolidated group, a currently authorized officer of the corporation who was the common parent corporation of the consolidated group for such consolidated return year(s) should sign the agreement in the name of the common parent corporation.  See Treas. Reg. § 1.1502-77(a).

9. If the Tax Matters Partner signs this offer, please include the title with the signature.

10. If the Tax Matters Partner is a subsidiary corporation in a consolidated group:

    • If the agreement is for a partnership year(s) ending on or before the last day of a consolidated return year beginning before June 28, 2002, then a currently authorized officer of the corporation who was the common parent corporation of the consolidated group for such consolidated return year should sign the agreement on behalf of the Tax Matters Partner.  The signature and title of a current officer of the common parent corporation, who is authorized to bind the common parent corporation, should be displayed in the signature block.  See Treas. Reg. § 1.1502-77A(a).  An authorized officer for the subsidiary corporation should also sign it if, as the Tax Matters Partner, is binding non-notice partners under the agreement.  The signature and title of a current officer of the subsidiary corporation, who is authorized to bind the corporation, should be displayed in the signature block

    • If the agreement is for a partnership year(s) ending on or before the last day of a consolidated return year beginning on or after June 28, 2002, then a currently authorized officer of the subsidiary corporation should sign the agreement in the name of the subsidiary corporation.  See Treas. Reg. § 1.1502-77(a)(3)(v). The agreement should also be signed by a currently authorized officer of the corporation who was the common parent corporation of the consolidated group for the relevant consolidated return year(s).  The signature and title of a current officer of the common parent corporation, who is authorized to bind the common parent corporation, should also be displayed in the signature block.

    **NOTE:**  The submission of this offer by you and the acceptance of the offer for the Commissioner may result in an additional tax liability to you plus interest as provided by law.  If the result is a decrease in tax, the amount of the decrease will be sent to you with interest as provided by law.

Catalog Number 57315A          www.irs.gov          (See Instructions for Signing Agreement)          Form **870-PT** (Rev. 4-2012)

**EXHIBIT A**

Department of the Treasury — Internal Revenue Service

## Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts

### SCHEDULE OF ADJUSTMENTS

| NAME OF PARTNERSHIP | TAX YEAR(S) ENDED | | |
|---|---|---|---|
| AGRO HOLDINGS LLC | | | |
| EIN ▮▮▮▮▮▮▮ | 12/31/2016 | | |
| DETAIL OF ADJUSTMENTS TO ORDINARY INCOME | | | |
| | | | |
| TOTAL ADJUSTMENTS TO ORDINARY INCOME | | | |
| OTHER ADJUSTMENTS | | | |
| A. Charitable contributions 30 percent | | | |
| (1) ADJUSTMENT | 41,000,000.00 | | |
| (2) AS REPORTED | 41,000,000.00 | | |
| (3) CORRECTED | 0.00 | | |
| B. | | | |
| (1) ADJUSTMENT | | | |
| (2) AS REPORTED | | | |
| (3) CORRECTED | | | |

REMARKS

The adjustments to Charitable Contributions are due to a gross valuation overstatement at the partnership level. Consideration of penalties at the partnership level resulted in the determination that the penalty for Gross Valuation Misstatement under IRC Section 6662(h) and/or any other alternative/applicable penalties including Substantial Valuation Misstatement under IRC 6662(e), Reportable Transaction Understatement under IRC 6662A, Substantial Understatement of Tax under IRC 6662(b)(2) & 6662(d) and Negligence or Disregard of Rules and Regulations under IRC 6662(b)(1) & 6662(c) should be asserted at the partner level.

**EXHIBIT A**

| Form **886-A** (Rev. January 1994) | **EXPLANATION OF ITEMS** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer<br><br>AGRO HOLDINGS LLC | Tax Identification Number | Year/Period ended<br>201612 |

You have not established that AGRO Holdings, LLC made a noncash charitable contribution during the tax year ended December 31, 2016.  To the extent you are able to establish that a noncash charitable contribution has been made, you failed to establish that it satisfied all the requirements of I.R.C. § 170 and the corresponding Treasury Regulations for deducting a noncash charitable contribution.  If it is determined that you have satisfied all the requirements of I.R.C. § 170 and the corresponding Treasury Regulations for deducting a noncash charitable contribution, you have not established the value of the noncash charitable contribution.  Accordingly, the charitable contribution claimed on AGRO Holdings, LLC's Return of Partnership Income (Form 1065) is reduced by $41,000,000.00 for the tax year ended December 31, 2016.

It is determined that the underpayments of tax resulting from the adjustment of partnership items of $41,000,000.00 are attributable to a gross valuation misstatement.  It is therefore determined that a 40% penalty shall be imposed on the underpayments of tax resulting from the gross valuation misstatement as provided by I.R.C. § 6662(h).

It is further determined that the adjustments to partnership items are attributable to a listed transaction under I.R.C. § 6707A(c), specifically a transaction described in Notice 2017-10.  These adjustments result in a reportable transaction understatement as defined in I.R.C. § 6662A(b).  If the I.R.C. § 6662(h) penalty is found not to apply to any portion of the understatement, then a 20% penalty under I.R.C. § 6662A applies to that amount.

It is further determined that any underpayments of tax from the adjustments of partnership items are attributable to (1) negligence or disregard of rules or regulations, (2) substantial understatements of income tax, and (3) substantial valuation misstatements, as provided by I.R.C. § 6662(c), (d), and (e), respectively.  Therefore, if the I.R.C. § 6662(h) penalty and I.R.C. § 6662A penalty are found not to apply to any portion of the misstatement or understatement, there shall be imposed in the alternative a 20% penalty on the underpayments of tax as a result of I.R.C. § 6662(c), (d), and (e).

To the extent that reasonable cause or any other defense to the penalties could apply, neither the partnership nor its partners have made such a showing.

**EXHIBIT A**