

**Received**

04/18/23 03:37 pm

**Filed**

04/18/23

FILED

2023 Jul-14  PM 06:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

Alameda Aggregates, LLC, Alameda Partners, LLC,
Partnership Representative,

      Petitioner(s)

      v.

Commissioner of Internal Revenue

      Respondent

Electronically Filed

Docket No. 5749-23

Document No. 1

# Petition

# UNITED STATES TAX COURT

| | | |
|---|---|---|
| ALAMEDA AGGREGATES, LLC, | ) | |
| ALAMEDA PARTNERS, LLC, | ) | |
| PARTNERSHIP REPRESENTATIVE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | DOCKET NO: _____ |
| | ) | |
| COMMISSIONER OF INTERNAL | ) | |
| REVENUE, | ) | |
| | ) | |
| Respondent. | ) | |

## PETITION FOR PARTNERSHIP ACTION UNDER BBA SECTION 1101[1]

_____

PETITIONER, ALAMEDA PARTNERS, LLC, HEREBY PETITIONS this Court as Partnership Representative ("PR") for Alameda Aggregates, LLC ("Alameda") for the tax period ending December 31, 2018 to dispute the Notice of Final Partnership Adjustment, dated March 10, 2023 ("FPA"), pertaining to the 2018 Form 1065 (U.S. Return of Partnership Income) for Alameda.[2]

_____

[1] Unless otherwise specifically stated, all uses of the terms "Section," "Sections," or "I.R.C." in this Petition refer to the Internal Revenue Code of 1986, as amended, and all uses of the terms "Treasury Regulation," "Treasury Regulations," or "Treas. Reg. §" in this Petition refer to the Treasury Regulations thereunder.

[2] The 2018 Form 1065 mentioned in the FPA pertains to the tax year beginning November 9, 2018 and ending December 31, 2018. It is referenced in this Petition as the "2018 Form 1065."

The core issue in this case is whether Alameda is entitled to the claimed charitable contribution deduction for its donation of a conservation easement on real property located in Jackson County, Alabama. On December 26, 2018, Alameda held approximately 209.22 acres of land (the "Property"). In enacting Section 170(h), Congress provided for a charitable tax deduction related to contributions of certain conservation easements to land trusts. In so doing, Congress recognized that "conservation . . . ultimately boil(s) down to rewarding the private landowner who conserves the public interest."[3] On its 2018 Form 1065, Alameda reported a $52,850,000 non-cash charitable deduction related to the conservation easement contribution, which among other things prohibited the Property from being used for mining.

The IRS has determined that the value of the conservation easement is worth nothing. In stark contrast, the $52,850,000 non-cash charitable deduction reported by Alameda was based on the analysis of (i) a qualified mining engineer, (ii) a second qualified mining engineer that reviewed the first mining engineer's analysis for reasonableness, (iii) a qualified appraiser with over 30 years of appraisal

---

[3] Randy T. Simmons, *Property Rights and The Endangered Species Act*, Institute for Research on the Economics of Taxation Studies in Social Cost, Regulation, and the Environment: No. 9 (April 2002). *See also* S. Rep. No. 96-1007, at 9 (1980) ("The committee believes that the preservation of our country's natural resources and cultural heritage is important, and the committee recognizes that conservation easements now play an important role in preservation efforts.").

experience and a qualified appraiser with over 6 years of appraisal experience, and (iv) two additional appraisers, one with over 18 years of experience in commercial and real estate appraising and another with over 40 years of experience in the commercial and real estate appraisal industry, that prepared reviews of the qualified appraisal.

The IRS publicly released an advanced copy of Notice 2017-10 on December 23, 2016.[4] Following the public release of Notice 2017-10, then counsel for the indirect managers of Petitioner provided the following non-privileged explanation of the "Monetization of Conservation Easement Transactions (1/18/17)":

> When Congress enacts tax incentives, it does so to encourage certain uneconomic behavior that generally would not occur absent the tax incentives. Many of these tax incentives are in the form of credits, such as historic rehabilitation credits, low income housing credits and renewable energy credits (wind and solar). The common characteristic of these incentives is they only act as an incentive for taxpayers who otherwise have a significant tax liability and who are eligible to participate in the incentive. If a taxpayer does not have a significant tax liability or is otherwise ineligible to participate in the incentive, then there is no incentive for the taxpayer to undertake the uneconomic activity that Congress is trying to encourage.
>
> In the case of most of these credit programs, the owner/developer of the property is not in a position to benefit from the tax incentive, either because the owner does not have a significant tax liability or the owner's participation is limited by technical tax rules e.g. passive loss rules, at risk basis rules etc. Historically the answer has been for the owner to form a partnership and admit into the partnership investors who can benefit from the

---

[4] The IRS formally published Notice 2017-10 on January 23, 2017.

prescribed benefit, and to allocate the credits or other tax benefits to the investor partners who have been admitted to the partnership. These investors are typically admitted to the partnership on the eve of the creation of the tax benefit e.g. on the day before the underlying property is placed in service by the investment partnership. In the case of low income housing credits, often the only economic benefit to be received by the investor is the tax credit (i.e. there is no expectation of any cash distributions or other economic return to the investor.) These investors generally are recognized as legitimate partners in the property owning partnership. Accordingly, investors are entitled to their allocable share of tax benefits that are generated after their admission to the partnership (even though the investors may have been admitted to the partnership only the day before the tax benefit is generated).[5]

It should also be noted that most of these programs involve promoters/syndicators who, for a fee, provide the necessary service of matching up property owners with investors. Nobody would suggest that the partnership structure does not work because somebody was paid a fee to facilitate the transaction.

Conservation easement transactions follow this same partnership structure. Congress has enacted incentives in the form of (i) providing a charitable deduction based on an appraised fair market value of the donated property, (ii) allowing a deduction for a donation of only a partial interest in the property (where otherwise only a donation of 100% of the fee title would qualify for a deduction), (iii) allowing an offset of up to 50% of the taxpayer's income (as opposed to 30% for other property donations), and (iv) allowing a 15 year carry forward of unused deductions (versus the usual 5 year carryforward period). Why did Congress do this? To encourage the most uneconomic

---

[5] "The Historic Boardwalk case is an exception where the appellate court held that the investor was not to be recognized as a partner and therefore ineligible to receive an allocation of historic rehabilitation credits. It should be noted that the Tax Court had reached the opposite conclusion and there is significant thought that this decision was wrongly decided, goes against a long history of precedent and in any event is only binding precedent in the 3rd Circuit." (footnote in original).

behavior of all—to give away valuable property that would preserve open space, scenic views or a natural habitat for wildlife and plants. Unfortunately, many landowners are not in the position to take advantage of this tax incentive. Not only may they not have a sufficient tax liability to absorb the tax benefits, but they may also lack the significant resources necessary to effect a conservation easement donation. The costs of biology reports, lawyers, accountants, land trusts, engineers, surveyors, appraisers, market feasibility reports, drilling tests, etc. are substantial. Moreover, any debt that encumbers the property to be conserved must be satisfied prior to donation. These immediate costs are often beyond the means of many landowners.

Therefore, utilizing the model established for other tax incentives, the landowner forms a partnership with investors who can provide the capital required to pay these costs and also possibly pay the owner for a portion of its interest in the partnership. These investors become partners in a partnership that owns real estate and are allocated profits, losses and deductions (including charitable deductions) derived by the partnership after the admission of the investors. There should be no suggestion that some kind of prohibited assignment of deduction has occurred (just as there is no suggestion that the allocation of post admission depreciation deductions to investors in a partnership that owns improved property should be deemed an assignment of deductions). Also, it is relevant that the investors continue to own an interest in a partnership that owns the property (and frequently other property) after the easement is donated. It should also be noted, that the use of promoters/syndicators to match up land owners with investors should not adversely impact the investment analysis.

Upon examination, the IRS determined that there "is no evidence that . . . endangered or threatened species have been identified or seen on the subject property, . . . and [this lack of evidence] is not sufficient to meet the significant

habitat requirement."[6] Contrary to Respondent's contentions, the property at issue has substantial conservation value.[7] The U.S. Fish & Wildlife Service has proposed removing 23 species, many of which were found only in the Southeastern United States, from the Federal Lists of Endangered and Threatened Wildlife and Plants due to extinction caused by climate change and habitat extinction.[8] In a press release, the U.S. Fish & Wildlife Service urged private landowners and others to take steps "to enhance wildlife habitat and improve biodiversity" through the conservation of land.[9] On the conserved property, qualified environmental experts have identified at least sixteen different rare, threatened, or endangered species ("RTEs").[10] Further, using methodology adopted by virtually every federal department or agency with environmental responsibility, qualified environmental economists conservatively

---

[6] Form 886-A at 183.

[7] See, e.g., Peter Kareiva, *Conservation Science and Practice*, Documenting the conservation value of easements (May 2021).

[8] Endangered and Threatened Wildlife and Plants; Removal of 23 Extinct Species from the Lists of Endangered and Threatened Wildlife and Plants, 86 Fed. Reg. 54,298, 54,298 - 54,338 (Sept. 30, 2021) (to be codified at 50 C.F.R. pt. 17).

[9] Press Release, U.S. Fish & Wildlife Service, U.S. Fish and Wildlife Service Proposes Delisting 23 Species from Endangered Species Act Due to Extinction (Sept. 29, 2021), https://www.fws.gov/news/ShowNews.cfm?ref=u.s.-fish-and-wildlife-service-proposes-delisting-23-species-from-&_ID=37017.

[10] "Rare, threatened, or endangered" species means any taxon that meets any of the following criteria: is listed, is a candidate for listing, or is recommended for listing as a threatened or endangered species under the Endangered Species Act (ESA) by the U.S. Fish and Wildlife Service, is ranked as, or for which an intermediate rank rounds to, Critically Imperiled (S1), Imperiled (S2), or Vulnerable (S3), or worse in the state by the Alabama Natural Heritage Program or by NatureServe.

calculate the net present value ("NPV") of the public interest benefits in the conservation to current and future generations to be approximately $24 million.

As the basis for its case, Petitioner alleges as follows:

1.    As of the date of this Petition, Alameda Partners, LLC, the Petitioner and PR, is an Alabama limited liability company having its principal place of business at 4355 Cobb Parkway, Suite J555, Atlanta, GA 30339.

2.    As of the date of this Petition, the PR's current mailing address is 4355 Cobb Parkway, Suite J555, Atlanta, GA 30339.

3.    Petitioner is the designated PR for Alameda with respect to its 2018 Form 1065.

4.    As of the date of this Petition, Alameda is an Alabama domestic limited liability company, and its principal place of business is in Alabama.

5.    Alameda is classified as a partnership for U.S. federal income tax purposes.

6.    Alameda filed its 2018 Form 1065 with the Internal Revenue Service Center in Ogden, Utah.

7.    Alameda's taxpayer identification number is set forth in the Statement of Taxpayer Identification Number, which is attached to this Petition.

8.    Petitioner, in its capacity as PR of Alameda, is filing this Petition within the 90-day period set forth in Section 6234(a)(1).

9. The Small Business and Self-Employed Division of the Internal Revenue Service located in Gainesville, Georgia issued an FPA relating to Alameda's 2018 Form 1065 on March 10, 2023, a copy of which is attached hereto as Exhibit A and which has been redacted pursuant to Tax Court Rule 27.

10. The FPA determined an imputed underpayment of income tax for the 2018 tax year in the amount of $19,554,500, and penalties in the amount of $14,665,875, based on the following adjustments:

    a. Disallowance of the $52,850,000 non-cash charitable contribution deduction pursuant to Section 170(h).

        i. Alternatively, the FPA determined that the allowable noncash charitable contribution amount is limited to $405,000.

    b. Assertion of the 75 percent civil fraud penalty, pursuant to Section 6663(a), applicable to the entire amount of the underpayment of tax attributable to the adjustment of $52,850,000.

    c. To the extent the civil fraud penalty is not sustained, assertion of the 40 percent gross valuation misstatement penalty, pursuant to Section 6662(h), or alternatively a 20 percent substantial valuation misstatement penalty, pursuant to Section 6662(e),

applies to the imputed underpayment. In addition, a 20 percent reportable transaction penalty, pursuant to Section 6662A, applies to the portion of the understatement to which the 40 percent valuation misstatement penalty does not apply.

d.  As an alternative to the reportable transaction penalty, an additional 20 percent penalty applies to the amount of the imputed underpayment to which the valuation misstatement penalty does not apply, and which is attributable to negligence or disregard of rules or regulations, pursuant to Section 6662(a), or a substantial understatement of income tax, pursuant to Section 6662(d).

e.  Alternatively, if the valuation misstatement penalty is not sustained, a 20 percent reportable transaction penalty, pursuant to Section 6662A, applies to the entire amount of any understatement of tax attributable to a reportable transaction.

f.  Alternatively, if the valuation misstatement and reportable transaction penalties are not sustained, a 20 percent penalty applies to the entire amount of any underpayment attributable to negligence or disregard of rules or regulations, pursuant to

Section 6662(a), or a substantial understatement of income tax, pursuant to Section 6662(d).

11. Petitioner disputes all proposed adjustments and determinations in the FPA.

12. Respondent erred in his determinations reflected in the FPA for the following reasons:

a. The donation of the conservation easement achieved the following valid conservation purposes, defined by Section § 170(h)(4):

i. The protection of a significant, relatively natural habitat of fish, wildlife, or plants or similar ecosystem, and

ii. The preservation of open space (including farmland and forest land) where such preservation will yield a significant public benefit and is (I) for the scenic enjoyment of the general public, or (II) pursuant to a clearly delineated Federal, State, or local governmental conservation policy.

b. No permitted use listed in the Deed of Conservation Easement (defined below) conflicts with any of the valid conservation purposes achieved by the donation of the easement.

c. In the 2018 tax year, Alameda contributed the conservation easement to a qualified land trust.

d. The donation of the conservation easement satisfied the requirements of Section 170 and the applicable Treasury Regulations thereunder.

e. The transaction(s), as structured, should be respected for Federal income tax purposes.

f. The fair market value ("FMV") of the conservation easement at the time of donation was not less than $52,850,000.

g. The amount of the deduction for the contribution of the Deed of Conservation Easement should not be limited to $405,000.

h. Respondent erred in asserting all penalties in the FPA.

13. Based on information and belief, the facts, and mixed points of fact and law, upon which Petitioner relies include, but are not limited to, the following:

### General

a. Alameda was classified as a partnership for federal tax purposes on December 31, 2018.

b. Petitioner owned 96.0158 percent of the profit, loss, and capital of Alameda on December 31, 2018.

c.      Four entities owned a total of 3.1442 percent of the profit, loss, and capital of Alameda on December 31,2018.

d.      Two individuals each owned 0.42 percent of Alameda, collectively comprising a total of 0.84 percent of the profit, loss, and capital of Alameda on December 31, 2018.

e.      Petitioner was appointed manager of Alameda on December 26, 2018.

f.      Alameda's designation of Petitioner as PR complies with the Internal Revenue Code and related Treasury Regulations.

g.      Alameda meets the net worth criteria described in Section 7430(c)(4)(A)(ii).

### **Property Background**

h.      As of December 27, 2018, Alameda owned the Property, located in Jackson County, Alabama.

i.      Alameda acquired the Property as a capital contribution by Statutory Warranty Deed, dated November 9, 2018.

j.      The Property is treated as long-term capital gain property pursuant to Sections 723 and 1223(2).

k.      The Property is located in an area with significant limestone reserves.

l.    The surficial geology is the Bangor and Monteagle Limestones formation.

m.    Bangor Limestone is predominantly light-to dark-gray, bioclastic and oolitic limestone.

n.    The Monteagle Limestone is light-to locally medium-gray, oolitic and bioclastic limestone.

### Title & Mining Due Diligence

o.    Alameda, recognizing the potential of developing the Property as a limestone mine, undertook certain due diligence to evaluate the feasibility of doing so.

p.    Alameda hired a professional land surveyor licensed in Alabama to prepare a survey of the Property (the "Survey").

q.    Alameda hired an Alabama law firm specializing in real estate law to prepare a title report on the Property (the "Title Report").

r.    Based upon the Title Report, dated November 26, 2018, Alameda owned the entire mineral and surface estate of the Property.

s.    The Title Report goes back to 1859, when patents were issued affecting the subject property.

t.    Alameda hired a national firm with over 25 years of experience in geotechnical, construction materials, and environmental and

facilities engineering (the "Geotechnical Engineer") to explore the bedrock conditions and determine the quality of the minerals on the Property.

u. As a part of the engagement, the Geotechnical Engineer (i) reviewed the available publications concerning local geology of the site and performed a general site reconnaissance, (ii) drilled two borings with rock coring to explore the subsurface bedrock conditions at the site and determined the quality of rock with depth, (iii) performed laboratory tests on selected representative rock core samples obtained from the borings to evaluate pertinent engineering properties, and (iv) prepared a report titled "Report of Geotechnical Exploration & Rock Testing Rock Study – Alameda Aggregates LLC Jackson County, Alabama" which presents the field and laboratory data obtained during the engagement (the "Geotechnical Report").

v. Between November 8, 2016 and November 14, 2016, the Geotechnical Engineer visited the Property with a drilling rig.

w. During the visits, the Geotechnical Engineer drilled two core samples, with an average depth of 76.5 feet below the surface, to explore the subsurface bedrock conditions.

x.    The limestone core samples were placed in boxes, classified, photographed, and a field geologic log was prepared.

y.    The Geotechnical Engineer worked with a professional engineering company that performs laboratory soil tests to evaluate the chemical composition and engineering properties of the rock core samples.

z.    The laboratory was certified by the Georgia Department of Transportation and accredited by the American Association of State Highway Transportation Officials. The laboratory subjected the limestone core samples to the following laboratory tests: (i) Carbonate Content Analysis performed in accordance with ASTM D3042 - Standard Test Method for Insoluble Residue in Carbonate Aggregates; (ii) LA Abrasion Test performed in accordance with ASTM C131/C535 - Standard Test Method for the Resistance to Degradation of Large-Size Coarse Aggregate by Abrasion and Impact in the Los Angeles Machine; (iii) Specific Gravity of Rock was determined using ASTM D854 - Standard Test Methods for Specific Gravity of Solids by Water Pycnometer; (iv) Physical Properties were determined using ASTM D7263; and (v) Soundness of Rock was

determined using AASHTO 104 - Standard Test Method for Soundness of Aggregate by Use of Sodium Sulfate or Magnesium Sulfate.

aa. The results of the laboratory testing are presented in the Geotechnical Report.

ab. A professional mining engineering firm (the "Mining Engineer") was engaged to analyze the Geotechnical Report and determine the feasibility for operating a limestone mine on the Property ("Mining Operation").

ac. The Mining Engineer possessed the following qualifications: (i) Master of Science degree in Mining Engineering; (ii) Master of Business Administration degree; (iii) Licensed as a Registered Professional Engineer in a number of states, including Alabama; (iv) Registered Founding Member of the Society for Mining, Metallurgy and Exploration; and (v) Licensed Member of the National Society for Professional Engineers.

ad. In 2018, the Mining Engineer possessed over 38 years of mining engineering experience and assisted mine operators with setting up and obtaining permits for over 100 mines nationwide, including 10 in Alabama.

ae.     The Mining Engineer prepared a report titled "Technical Due Diligence Prefeasibility Study Business Plan and Valuation" for the Property (the "Mining Business Plan").

af.     The Mining Business Plan concludes that the Property contains Proven Mineral Reserves of approximately 38.601 million tons of limestone.

ag.     The Mining Business Plan concludes that the limestone material from the core samples passes the standards set out by the Alabama, Georgia, and Tennessee Departments of Transportation standards for use in all coarse aggregate applications and also met the specifications and requirements for general construction applications.

ah.     The Mining Business Plan concludes that there were no local zoning restrictions that could limit the ability to operate a mine on the Property.

ai.     The Mining Business Plan concludes that it was highly and reasonably probable that the Mining Operation could obtain all necessary permitting within twelve to eighteen months.

aj.    The Mining Business Plan concludes that the project as stated and described on the Property was "viable and its success highly probable in the given market."

ak.    The Mining Business Plan projects a NPV of approximately $53.052 million for a limestone mine on the Property.

al.    Alameda hired a second Registered Professional Engineer to review the Mining Business Plan and prepare a "Desktop Review of Technical Due Diligence Prefeasibility Study Business Plan and Valuation" (the "Orlandi Desktop Review").

am.    The Orlandi Desktop Review concludes that the Mining Business Plan "uses sound engineering judgement and state-of-the-art mining industry software to determine the technical and business feasibility of the Project."

an.    The Orlandi Desktop Review concludes that the reserve calculations presented in the Mining Business Plan were accurate and complete.

ao.    The Orlandi Desktop Review concludes that that there are no zoning restrictions that would limit the ability to mine the Property.

ap. The Orlandi Desktop Review concludes that the price assumed in the Mining Business Plan is below that of any surrounding operations based on an analysis of Department of Transportation bids, and the price assumed in the Mining Business Plan was reasonable and will allow for market penetration.

aq. The Orlandi Desktop Review concludes that the additional reserves available below a depth of 29 feet into the limestone increases the viability of developing a limestone mine on the Property.

ar. The Orlandi Desktop Review concludes that a NPV of $53.052 million is reasonable based on the assumptions, data, and analysis provided in the Mining Business Plan.

### Phase 1 Environmental Site Assessment Report

as. Nova Consulting Group Inc. ("Nova") was engaged to conduct an Environmental Site Assessment ("ESA") on the Property.

at. Nova prepared a Phase I Environmental Site Assessment Report ("Phase 1 Report").

au. Nova conducted the ESA in general accordance with the scope and limitations of ASTM Designation E 1527-2013, "Standard

Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process."

av.    The Phase I Report contains the environmental professionals' resumes, analysis, topographic maps, aerial photographs, a regulatory database evaluation report, and additional information that includes a boundary survey.

aw.    Nova concluded that there is no evidence of recognized environmental conditions, controlled recognized environmental conditions, or historical recognized environmental conditions in connection with the Property.

ax.    Based on the information available during the course of the ESA, Nova did not recommend further assessment of the Property at that time.

### Baseline Documentation Report

ay.    Recognizing the potential conservation values of the Property, Alameda engaged Compatible Lands Foundation, Inc. ("CLF") to undertake certain diligence to investigate and confirm the Property's conservation values pursuant to a proposal letter, dated November 8, 2018.

az.    CLF is an Oklahoma corporation that was a federal tax-exempt organization under Section 501(c)(3) at all times during 2018.

ba.    Anita L. Barstow, MS, a Wildlife Ecologist and Conservation Specialist at ALB Environmental Services LLC, and Drew D. Troyer, CRE, Director of Private Conservation and Chairman of the Board of CLF, visited the Property to assess the conservation values and prepare a "Baseline Documentation Report."

bb.    Anita L. Barstow and Drew D. Troyer memorialized their findings in a Baseline Documentation Report, dated December 23, 2018, which documented the current physical condition and status of the Property and identified the conservation values.

bc.    The Baseline Documentation Report contains numerous maps covering the Property, including U.S. Geological Survey topographic maps, aerial maps, and photographs.

bd.    The Baseline Documentation Report contains numerous photographs taken at various locations on the Property.

be.    The Baseline Documentation Report indicates that the Property "consists of nearly 100% intact un-fragmented native woodland habitats" and "there are numerous threatened or endangered species that are known to exist within the vicinity, including the

endangered Gray Bat…endangered Indiana Bat, and the threatened North Long-eared Bat."

bf.   The Baseline Documentation Report concludes that conserving the Property would protect a relatively natural habitat.

bg.   The Baseline Documentation Report concludes that conserving the Property would result in multiple significant public benefits, including the preservation of open space (including farmland and forest land) where such preservation is pursuant to a clearly delineated federal, state, or local government conservation policy and where such preservation is for the scenic enjoyment for the general public.

### Member Vote

bh.   The members of Alameda considered the following options: (i) hold the Property for long-term investment, (ii) lease the Property to a third-party mining company, (iii) operate the Property as a mine, or (iv) conserve the Property.

bi.   The members of Alameda voted to conserve the Property in perpetuity by granting a conservation easement on the Property (the "Conservation Easement").

## **Donation of Conservation Easement**

bj.    On December 27, 2018, Alameda granted a Deed of Conservation Easement (the "Deed of Conservation Easement" or "Deed") encumbering the Property in favor of CLF.

bk.    CLF was a "qualified organization" for purposes of Section 170 and the Treasury Regulations thereunder as of December 27, 2018.

bl.    CLF was an "eligible donee" for purposes of Section 170 and the Treasury Regulations thereunder as of December 27, 2018.

bm.    The Property was not subject to a mortgage as of December 27, 2018.

bn.    The Conservation Easement was a "qualified real property interest" for purposes of Section 170 and the Treasury Regulations thereunder.

bo.    Alameda did not contribute the Conservation Easement to CLF in a bargain sale.

bp.    Alameda did not receive any consideration from CLF in exchange for donating the Conservation Easement.

bq.    Alameda did not receive any consideration from any other party in exchange for donating the Conservation Easement to CLF.

## Deed of Conservation Easement

br.     The Probate Court Judge of Jackson County, Alabama recorded the Deed on December 28, 2018.

bs.     The Deed incorporates the Baseline Documentation Report, dated December 23, 2018.

bt.     The Deed identifies various conservation purposes.

bu.     The Deed indicates that the Conservation Easement will protect a significant, relatively natural habitat of fish, wildlife, or plants, or similar ecosystem.

bv.     The Deed indicates that the Conservation Easement will preserve open space (including farmland and forest land) pursuant to a clearly delineated governmental policy, and will yield a significant public benefit.

bw.     The Deed indicates that the Conservation Easement will preserve open space (including farmland and forest land) for the scenic enjoyment of the general public and will yield a significant public benefit.

bx.     The Deed protects the Property as a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem, which qualifies as a conservation purpose as defined by Section 170(h)(4)(A)(ii).

by.     The Deed protects the Property as an open space (including farmland and forestland), where such preservation is pursuant to a clearly delineated federal, state, or local governmental policy, and will yield a significant public benefit, which qualifies as a conservation purpose as defined by Section 170(h)(4)(A)(iii)(II).

bz.     The Deed protects the Property as an open space (including farmland and forestland), where such preservation is for the scenic enjoyment for the general public and will yield a significant benefit, which qualifies as a conservation purpose as defined by Section 170(h)(4)(A)(iii)(I).

ca.     The Deed indicates that the purpose of the Conservation Easement is to (i) assure that the Property will be retained predominantly in its natural, scenic, and open space condition, (ii) prevent any use of the Property that will significantly impair or interfere with the Conservation Values of the Property, (iii) confine the use of the Property to such activities, including, without limitation, those involving traditional ranching or other agricultural and agroecology uses that are consistent with the purpose of this Easement, and (iv) the duration of this Easement shall be in perpetuity.

cb. The Deed identifies the specific conservation values of the Property.

cc. The Baseline Documentation Report documents the specific conservation values of the Property.

cd. The Deed provides CLF the rights to preserve and protect the conservation values of the Property in perpetuity.

ce. The Deed permits CLF to enter the Property at reasonable times, to monitor compliance with the Deed, enforce the terms of the Conservation Easement, and prevent any activity or use of the Property that is inconsistent with the purpose of the Conservation Easement.

cf. The Deed prohibits Alameda and all future owners from surface mining or quarrying of soil, sand, or other minerals; except that the Grantor may extract soil, sand, gravel solely for a permitted use on the Property in a manner consistent with the conservation purpose of this Deed, and be both minimal in scope and impact.

cg. The restrictions on the use of the Property stated in the Deed are binding on Alameda and all future owners of the Property in perpetuity.

ch.   The Deed provides a formula for calculating CLF's proportionate share of extinguishment proceeds that fully complies with the requirements of Treas. Reg. § 1.170A-14(g)(6)(ii).

**Contemporaneous Written Acknowledgement of Conservation Easement**

ci.   CLF provided a letter to Alameda dated December 27, 2018, acknowledging receipt of the donation of the Conservation Easement (the "Conservation Easement Donation Acknowledgment Letter").

cj.   The Conservation Easement Donation Acknowledgment Letter confirms that CLF did not provide any goods or services in exchange for the donation of the Conservation Easement.

ck.   The Conservation Easement Donation Acknowledgment Letter constitutes a "contemporaneous written acknowledgement" for purposes of Section 170 and the Treasury Regulations thereunder.

**Qualified Appraisers for Conservation Easement**

cl.   Two qualified and licensed MAI appraisers with over 37 years of combined appraisal experience[11], including experience

---

[11] *The Best of the Best*, APPRAISAL INSTITUTE, http://www.appraisalinstitute.org/assets/1/29/maidesignation.pdf (last visited

appraising land and conservation easements (collectively, the "Appraisers") prepared an "Appraisal Report," dated February 6, 2019, (the "Easement Appraisal") to determine the FMV of the Conservation Easement.

cm. The Appraisers were not direct partners of Alameda.

cn. The Appraisers were not indirect partners of Alameda.

co. The Appraisers did not claim, report, or otherwise take a deduction under Section 170 or any other tax provision for the donation of the Conservation Easement.

cp. The Appraisers were not parties to the transaction in which Alameda acquired the Property.

cq. The Appraisers were not the donees of the Conservation Easement.

cr. The Appraisers were not employees of (i) Alameda, (ii) direct partners of Alameda, (iii) indirect partners of Alameda, (iv) parties to the transaction in which Alameda acquired the Property, (v) CLF, or (vi) Petitioner.

---

March 16, 2023) ("The Appraisal Institute confers MAI Designated membership on commercial and general real estate appraisal professionals demonstrating the highest standards of education, expertise and ethics.").

cs.    The Appraisers were not "related" under Section 267(b) to any of the persons described immediately above.

ct.    Each of the Appraisers performed a majority of their appraisals in 2018 for parties other than Alameda.

cu.    Each of the Appraisers was a "qualified appraiser," as defined by Section 170 and the Treasury Regulations thereunder.

### Qualified Appraisal of Conservation Easement

cv.    The Appraisers have local knowledge and experience in preparing appraisals related to conservation easements.

cw.    The Easement Appraisal is dated February 6, 2019.

cx.    The Appraisers dated the Easement Appraisal before the extended deadline for Alameda to file its 2018 Form 1065 on which it claimed the charitable deduction related to the donation of the Conservation Easement.

cy.    The Appraisers signed and dated the Easement Appraisal.

cz.    The Easement Appraisal contains a detailed legal description of the Property.

da.    The Easement Appraisal contains a detailed legal description of the Conservation Easement.

db.	The Easement Appraisal contains a description of the physical condition of the Property.

dc.	The Easement Appraisal states that Alameda donated the Conservation Easement to CLF on December 27, 2018.

dd.	The Easement Appraisal contains the names, addresses, appraiser certification license numbers, and the partial social security numbers of the Appraisers.

de.	The Easement Appraisal contains the name, address, and taxpayer identification number of the appraisal company.

df.	The Easement Appraisal contains a list of the qualifications of the Appraisers, including their background, experience, education, and membership in professional associations.

dg.	The Easement Appraisal contains a statement that it was prepared for Alameda's potential use regarding the preparation and filing of federal income tax returns.

dh.	The Easement Appraisal states that it was prepared in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP").

di.  The Easement Appraisal provides the basis for the conclusions by the Appraisers regarding the FMV of the Conservation Easement.

dj.  The Easement Appraisal concludes that the highest and best use ("HBU") for the Property, before the donation of the Conservation Easement, was limestone mining (the "Before-Donation-HBU").

dk.  The Easement Appraisal concludes that the Before-Donation-HBU was legally permissible.

dl.  The Easement Appraisal concludes that the Before-Donation-HBU was physically possible.

dm.  The Easement Appraisal concludes that the Before-Donation-HBU was financially feasible.

dn.  The Easement Appraisal concludes that the Before-Donation-HBU was maximally productive.

do.  The Easement Appraisal concludes that the FMV of the Property before Alameda donated the Conservation Easement was $53,050,000.

dp.     The Easement Appraisal concludes that the FMV of the Property after Alameda donated the Conservation Easement was $200,000.

dq.     The Easement Appraisal concludes that the FMV of the Conservation Easement was $52,850,000.

dr.     The Easement Appraisal concludes that the FMV of the Conservation Easement does not enhance the value of any other property owned by Alameda or any person related to Alameda.

ds.     In determining the FMV of the Property before the donation of the Conservation Easement, the Appraisers considered both the sales-comparison approach and the income approach.

dt.     The Appraisers concluded that the sales-comparison approach was limited and inadequate for the valuation of the subject property.

du.     To determine the FMV of the Property before the donation of the Conservation Easement, under the income approach, the Appraisers used the discounted cash flow ("DCF") method related to the extraction and sale of the limestone reserves on the Property.

dv.  The DCF method is an acceptable appraisal method for valuing real property that contains a significant amount of underlying mineral reserves.

dw.  Under the income approach, the Appraisers determined that the FMV of the Property before the donation of the Conservation Easement was $53,050,000.

dx.  The Easement Appraisal concludes that the HBU of the Property after the donation of the Conservation Easement was agricultural or forestry use; recreational use as outlined by the Conservation Easement or conservation of the land for public enjoyment and the preservation of natural forested areas for the benefit of botanical species and wildlife (the "After-Donation-HBU").

dy.  The Easement Appraisal concludes that the After-Donation-HBU was legally permissible.

dz.  The Easement Appraisal concludes that the After-Donation-HBU was physically possible.

ea.  The Easement Appraisal concludes that the After-Donation-HBU was financially feasible.

eb.  The Easement Appraisal concludes that the After-Donation-HBU was maximally productive.

ec.    To determine the FMV of the Property after the donation of the Conservation Easement, the Appraisers used a sales-comparison approach and analyzed eight sales of properties encumbered with conservation easements.

ed.    The fees charged by the Appraisers for preparation of the Easement Appraisal were not based on a percentage of the appraised value of the Conservation Easement.

ee.    The fees charged by the Appraisers for preparation of the Easement Appraisal were not based on a percentage of the amount allowable as a charitable deduction under Section 170.

ef.    The Easement Appraisal was a "qualified appraisal," as defined by Section 170 and the Treasury Regulations thereunder.

### First Review of the Easement Appraisal

eg.    Alameda engaged a second appraisal firm to prepare an "Appraisal Review Report" of the Easement Appraisal and provide an opinion of the Easement Appraisal's conformance in accordance with regulations, standards, and guidelines and to determine the appraisal's acceptability with regard to adequately supporting the FMV conclusion (the "First Easement Appraisal Review").

eh.  The First Easement Appraisal Review is dated March 28, 2019.

ei.  The First Easement Appraisal Review was prepared under the appraisal standards set out by USPAP.

ej.  The First Easement Appraisal Review included a summation of the description of the Property, the data used in the Easement Appraisal, the methods employed by the Appraisers in the Easement Appraisal, and the assumptions and conclusions made by the Appraisers in the Easement Appraisal.

ek.  The First Easement Appraisal Review concludes that the Easement Appraisal is a qualified appraisal completed by a qualified appraiser.

el.  The First Easement Appraisal Review concludes the Easement Appraisal includes all of the necessary descriptions, methodologies, market data, and analysis to support all of the conclusions made including the HBU and FMV estimates.

em.  The First Easement Appraisal Review agrees that the FMV of the Conservation Easement was $52,850,000.

**Second Review of the Easement Appraisal**

en.  Alameda engaged a second appraisal firm to prepare a review of the Easement Appraisal and evaluate the Easement Appraisal for

credibility, including providing an opinion of the analyses, opinions and conclusions in the Easement Appraisal (the "Second Easement Appraisal Review").

eo.  The Second Easement Appraisal Review is dated February 24, 2019.

ep.  The Second Easement Appraisal Review was certified that it was prepared under the appraisal standards set out by USPAP.

eq.  The Second Easement Appraisal Review included a description of the Property, the data used in the Easement Appraisal, the methods employed by the Appraisers in the Easement Appraisal, and the assumptions and conclusions made by the Appraisers in the Easement Appraisal.

er.  The Second Easement Appraisal Review concludes that the Easement Appraisal is a qualified appraisal prepared by a qualified appraiser.

es.  The Second Easement Appraisal Review concludes that the Easement Appraisal presents a reasonable and credible value conclusion given the data and analysis as presented in the Easement Appraisal.

et.   The Second Easement Appraisal Review agrees that the FMV for the Conservation Easement was $52,850,000.

### Filings with Respondent

eu.   Alameda timely filed its 2018 Form 1065.

ev.   The 2018 Form 1065 reports, among other items, (i) the donation of the Conservation Easement to CLF, and (ii) the donation of stewardship fees to CLF.

ew.   Schedule K (Partner's Distributive Share Items) to the 2018 Form 1065 shows, among other items, charitable contributions of $52,885,000 related to the donation of the Conservation Easement and the cash donation.

ex.   Alameda attached the Easement Appraisal to its timely filed 2018 Form 1065.

ey.   Alameda maintained all records required with respect to the 2018 Form 1065.

### Form 8283 for Donation of the Conservation Easement

ez.   Alameda attached two Forms 8283 (Noncash Charitable Contributions) to its 2018 Form 1065 to report the donation of the Conservation Easement to CLF.

fa.   Both Forms 8283 contain all the information required by Treas. Reg. § 1.170A-13(c)(4) with respect to the donation of the Conservation Easement.

fb.   Both Forms 8283 report the FMV of the Conservation Easement.

fc.   Both Forms 8283 report Alameda's adjusted basis in the Property.

fd.   Both Forms 8283 report the manner by which Alameda obtained the Property.

fe.   Both Forms 8283 report the date on which Alameda obtained the Property.

ff.   Robert Gregory, Executive Director of CLF, signed and dated the Forms 8283 on behalf of CLF.

fg.   Each Appraiser signed and dated a Form 8283.

fh.   Both Forms 8283 contain the name and taxpayer identification number of Alameda.

fi.   Both Forms 8283 contain the name, address, and taxpayer identification number of CLF.

fj.   Both Forms 8283 identify the date on which CLF received the donation.

fk. Both Forms 8283 indicate that Alameda donated the Conservation Easement to CLF.

fl. Each Form 8283 contains the name of an Appraiser.

fm. Each Form 8283 contains the name, address, and tax identification number of the appraisal company.

fn. Each Form 8283 contains a certification by the Appraiser stating that (i) he performed appraisals on a regular basis, (ii) he was qualified to make appraisals of the type of property being valued, (iii) the fee charged for the appraisal was not based on a percentage of the appraised property value, (iv) he was not one of the persons described in Treas. Reg. § 1.170A-13(c)(5)(iv), (v) he understood that an intentionally false or fraudulent overstatement of the value of the property may subject him to a civil penalty under Section 6701, and (vi) he was not barred from presenting evidence or testimony by the Office of Professional Responsibility.

fo. The statements by each of the Appraisers in the Forms 8283 described immediately above were accurate.

**IRS Notice 2017-10**

fp.    On December 23, 2016, Respondent released an advance copy of Notice 2017-10,12 which identified donations such as that undertaken by Alameda as listed transactions.

fq.    Notice 2017-10 was not published in the Federal Register and did not provide the public with an opportunity to provide comments thereon. Nor did Notice 2017-10 include any finding of good cause that notice and public comment procedures were impracticable, unnecessary, or contrary to the public interest.

fr.    Alameda submitted a Form 8886 with its 2018 Form 1065, fully disclosing its donation of the Conservation Easement.

fs.    The Partnership also mailed a copy of the completed Form 8886 to Respondent's Office of Tax Shelter Analysis at the same time it filed its 2018 Form 1065.

ft.    Petitioner directs the Tax Court to its' decision in Green Valley Investors, LLC v. Commissioner, 159 T.C. No. 5 (2022), which held that Notice 2017-10 was invalid because it was issued without following the notice-and-comment rulemaking

---

[12] Notice 2017-10 was published in the Internal Revenue Bulletin on January 23, 2017.

procedures set forth in section 553 of the Administrative Procedure Act, 5 U.S.C. §§ 551 – 559.

fu.     Petitioner also directs the Tax Court to the 6th Circuit's decision in Mann Construction, Inc. v. United States, 27 F.4th 1138 (6th Cir. 2022), which invalidated a different IRS listing notice for similar reasons.

## History of the Tax Dispute

fv.     Alameda maintained all records required with respect to the 2018 Form 1065.

fw.     Alameda cooperated with Respondent during the audit.

fx.     Alameda cooperated with all requests by Respondent for information, documents, and meetings during the audit.

fy.     Representatives of Alameda provided a tour of the Property to Respondent during the audit.

## Contents of FPA

fz.     The FPA does not describe any specific facts, legal theories, tax theories, or analysis for asserting the adjustment of $52,850,000 to the 2018 Form 1065.

ga.   The FPA does not describe any specific facts, legal theories, tax theories, or analysis for possible defenses and/or exceptions to the penalties asserted.

gb.   Respondent relied only on his own employees in making the determinations set forth in the FPA.

gc.   Respondent did not rely on any independent environmental, ecological, real estate, scientific, mining, financial, economic, engineering, history, valuation or other professionals in making the determinations set forth in the FPA.

### Push-out Election

gd.   Petitioner has made an election on behalf of Alameda to "push-out" the adjustments and tax liability for any final adjustments to Alameda's 2018 Form 1065 to Alameda's members pursuant to Internal Revenue Code Section 6226(a). Under this election, Alameda's members for the 2018 tax year will be responsible for any additional tax liability and any penalties resulting from a final determination with respect to the items in dispute in this matter. Alameda will not be liable for any tax on an "imputed underpayment" or for any penalties resulting from a final decision in this matter.

**Compliance Efforts**

ge.   Alameda complied with Section 170 and the Treasury Regulations thereunder with respect to the donation of the Conservation Easement.

gf.   In claiming the charitable deduction related to the donation of the Conservation Easement on its 2018 Form 1065, Alameda relied on the Survey, Title Report, Phase I Report, Geotechnical Report, Mining Business Plan, Orlandi Desktop Review, Easement Appraisal, First Easement Appraisal Review, Second Easement Appraisal Review, Deed of Conservation Easement, Baseline Documentation Report, and all sources cited in such documents.

gg.   Alameda reasonably relied on the Survey, Title Report, Phase I Report, Geotechnical Report, Mining Business Plan, Orlandi Desktop Review, Easement Appraisal, First Easement Appraisal Review, Second Easement Appraisal Review, Deed of Conservation Easement, Baseline Documentation Report, and all sources cited in such documents.

gh.   Alameda reasonably relied on the qualified, independent, informed professionals who prepared the Survey, Title Report,

Phase I Report, Geotechnical Report, Mining Business Plan, Orlandi Desktop Review, Easement Appraisal, First Easement Appraisal Review, Second Easement Appraisal Review, Deed of Conservation Easement, and Baseline Documentation Report.

gi.  Prior to the transaction at issue, a team of attorneys from Morris, Manning & Martin, LLP, as well as other advisors, provided advice to the indirect managers of Petitioner related to the implementation of transactions substantially similar to the transaction at issue in this case. The advice also included guidance on how to comply with the applicable laws governing the tax treatment, reporting, and disclosure of substantially similar transactions. The attorneys from Morris, Manning & Martin, LLP worked extensively on the drafting, preparation, review, and execution of documents relating to the implementation and reporting of transactions substantially similar to the transaction at issue in this case. This included, but was not limited to, entity formations and governing documents, investor documentation, deed of conservation easement, mining business plan, baseline report, easement appraisal, and related tax filings.

gj.    In addition, Alameda and Petitioner reasonably relied upon other attorneys, accountants, tax advisors, and experts that reviewed documents and provided advice to the indirect managers of Petitioner relating to the transactions.

gk.    The advice provided to Alameda and Petitioner was informed by statements and presentations by IRS representatives concerning conservation easements.

14.    The contents of the FPA, particularly the allegation that the charitable deduction related to the donation of the Conservation Easement should be zero, are erroneous, unreasonable, arbitrary, and capricious.

15.    Because of this court's ruling in <u>Green Valley Investors, LLC v. Commissioner</u>, Respondent's assertion of penalties under Section 6662A is not applicable.

16.    Respondent bears the burden of proof as to all matters.

WHEREFORE, Petitioner requests that the Tax Court:

(i)    Determine that the 2018 Form 1065 is accurate as filed;

(ii)   Determine that the amount of the imputed underpayment is zero and that there are no adjustments, penalties, additions to tax, or other amounts due with respect to the 2018 Form 1065;

(iii)   Determine that Respondent cannot apply reportable transaction penalties under Section 6662A;

(iv)   If warranted by the evidence at trial, determine that Alameda undervalued the Conservation Easement and increase the amount of the non-cash charitable donation deduction for 2018 accordingly;

(v)    Determine that Respondent has the burden of proof on all issues; and

(vi)   Grant such other and further relief that it deems appropriate.


Date:  April 18, 2023                    Respectfully submitted,


_____
Michael Todd Welty
Tax Court Bar No. WM0494
TODD WELTY, P.C.
4279 Roswell Rd NE
Suite 208, #352
Atlanta, Georgia 30342
Telephone:  (404) 301-4791
Facsimile:  (678) 840-3481
E-mail:  todd@toddweltypc.com

Andrew Steigleder
Tax Court Bar No. SA0856
TODD WELTY, P.C.
4279 Roswell Rd NE
Suite 208, #352
Atlanta, Georgia 30342
Telephone:  (404) 793-5402
E-mail:  andy@toddweltypc.com


Kevin Johnson
Tax Court Bar No. JK0059
TODD WELTY, P.C.
4279 Roswell Rd NE
Suite 208, #352
Atlanta, Georgia 30342
Telephone: (404) 835-1601
E-mail:  kjohnson@toddweltypc.com


Lyle Press
Tax Court Bar No. PL0222
TODD WELTY, P.C.
4279 Roswell Rd NE
Suite 208, #352
Atlanta, Georgia 30342
Telephone:  (404) 301-4791
E-mail:  lyle@toddweltypc.com

Macdonald A. Norman
Tax Court Bar No. NM0188
TODD WELTY, P.C.
4279 Roswell Rd NE
Suite 208, #352
Atlanta, Georgia 30342
Telephone: (404) 239-2064
E-mail: mac@toddweltypc.com

Michael B. Ziegler
Tax Court Bar No. ZM0099
TODD WELTY, P.C.
4279 Roswell Rd NE
Suite 208, #352
Atlanta, Georgia 30342
(404) 239-2105
E-mail: mike@toddweltypc.com

COUNSEL FOR PETITIONER



 **Department of the Treasury
Internal Revenue Service
Small Business/Self Employed**
329 Oak Street, Suite 104
Gainesville, GA 30501

Alameda Aggregates LLC
4355 Cobb Parkway, Suite J 555
Atlanta, GA 30339

**Certified Mail**        7021 2720 0001 6900 8520

**Date:**
3-10-2023
**Partnership name:**
Alameda Aggregates LLC
**Partnership ID number (last 4 digits):**
█████

**Tax year ended:**
201812
**Form:**
1065
**Audit control number:**
1812000746
**Person to contact:**
Name: C. Workman
ID number: 535656
Telephone: (770)906-9188
**Last day to make an election under Internal Revenue Code Section 6226 with respect to an imputed underpayment:**
4-24-2023
**Last day to file a petition:**
6-8-2023

## Notice of Final Partnership Adjustment

Dear Alameda Aggregates LLC:

We're required by law to send a Notice of Final Partnership Adjustment (FPA) under Internal Revenue Code (IRC) Section 6231(a)(3) to the partnership and the partnership representative for the tax year above.

We've adjusted certain partnership-related items for the tax year above. We've enclosed a computation of any imputed underpayments and any IRS-approved modifications made after we issued the notice of proposed partnership adjustment (NOPPA). The computation shows the adjustments, how we determined any imputed underpayments, and any applicable penalties, additions to tax and additional amounts.

| Imputed underpayment type | Imputed underpayment (Included in the NOPPA) | Imputed underpayment | Penalties |
|---|---|---|---|
| General | $19,554,500.00 | $19,554,500.00 | $14,665,875.00 |
| Specific 1 | $0.00 | $0.00 | $0.00 |
| Specific 2 | $0.00 | $0.00 | $0.00 |
| Specific 3 | $0.00 | $0.00 | $0.00 |
| Specific 4 | $0.00 | $0.00 | $0.00 |

**Letter 5933 (Rev. 8-2022)**
Catalog Number 69571C

**EXHIBIT A**

**What you need to do**

**If you agree with the adjustments and want to bind the partnership**
The partnership representative must sign and return the enclosed Form 15027, Partnership Summary of Approved Modifications and the Imputed Underpayments, within 90 days from the date of this letter. Mail it to the address at the top of the first page of this letter or electronically submit Form 15027. You can find information on electronically filing forms at **IRS.gov/bbaesubmit**. When you sign Form 15027 to bind the partnership and partners, you are:

- Agreeing to the partnership adjustments
- Agreeing to any imputed underpayments and any penalties, additions to tax and additional amounts

The partnership can make an advance payment of the imputed underpayment, penalty and interest amounts shown on the Form 15027. Making an advance payment in full will stop additional interest and penalties from accruing after we receive the payment. You can choose to make a payment using any of the electronic payment options found on **IRS.gov/payments**. If paying electronically, be sure to select the correct tax year under examination and indicate "Advance BBA Exam Imputed Underpayment" when prompted. You can also choose to include a check or money order made payable to the United States Treasury when you return your signed Form 15027 to the address at the top of the first page of this letter. Be sure to include your tax identification number, tax year, "Form 1065" and "Advance BBA Exam Imputed Underpayment" on your check or money order.

**If you want to elect the alternative to payment of the imputed underpayment**
The partnership can elect the alternative to payment of the imputed underpayment whether you agree or disagree with the partnership adjustments. Under IRC Section Code 6226, a partnership can elect to have its reviewed year partners (the partners from the year under audit) take responsibility for the partnership adjustments and pay any resulting tax, penalties and interest on the partners' individual income tax returns.

To elect the application of IRC Section Code 6226, you must electronically submit Form 8988, Election for Alternative to Payment of the Imputed Underpayment - IRC Section Code 6226. You must make the election within 45 days from the date of this letter, regardless of whether the partnership plans to contest the FPA in court. The time allowed for filing an election is set by law and we cannot extend it. You can find information on electronically filing Form 8988 at **IRS.gov/bbaesubmit**. You must attach a copy of this Notice of Final Partnership Adjustment when you submit Form 8988. If you agree to the partnership adjustments, you should also sign and attach Form 15027.

If the partnership makes this election, you must provide to the partners and submit to the IRS the required statements under IRC Section Code 6226. If the partnership's intention is to petition the court as described below, you must wait to submit the required statements until after the expiration of the 90 days to file a petition for readjustment (explained below) or a final court decision (if you file a petition), whichever is later. If the partnership submitted a Form 8988 and a signed Form 15027 as described above, you must wait until receiving IRS approval of Form 8988 before submitting the required statements under IRC Section Code 6226 to the partners and the IRS.

**If you disagree with the adjustments**
The partnership representative must file a petition for readjustment within 90 days from the date of this letter. You can file your petition for readjustment with one of the following courts:

- United States Tax Court
- United States Court of Federal Claims
- District Court of the United States, in the district of the partnership's principal place of business

**EXHIBIT A**

When a partnership files a petition in either the Court of Federal Claims or the appropriate district court, the partnership must deposit the imputed underpayment (plus any applicable penalties, additions to tax or additional amounts) with the IRS, as if the court fully sustained the FPA.

We treat the deposit as a tax payment only for the purpose of computing interest. If the court dismisses the petition, you can request a refund of the deposit. The deposit requirement is satisfied if you make a good faith effort to deposit the correct amount and timely pay any shortfall. You can bring or mail in a deposit to any function within IRS. Include the following with the payment:

- The partnership's taxpayer ID number
- The tax period as shown at the top of this letter
- A note that the deposit is a bond to go to United States Court of Federal Claims or District Court

If there is more than one imputed underpayment in this FPA, you must deposit all imputed underpayments (plus any applicable penalties, additions to tax or additional amounts) for the adjustments the partnership will be contesting. You must deposit the payment on or before the day you file the petition.

When you file the petition, you must attach copies of this letter, and all statements you received with this letter, to the petition, and include the filing fee. In addition, if you previously met with the IRS Independent Office of Appeals and signed a Form 14792-A, Agreement as to Partnership-Related Items and Partnership-Level Determinations as to Penalties, Additions to Tax, and Additional Amounts, please include that with your petition.

The time allowed for filing a petition with the court is set by law, and the court can't consider your case if you file late.

You can download a fillable petition form and get information about filing at **ustaxcourt.gov** or by contacting the Office of the Clerk of the United States Tax Court at the address below. The Tax Court encourages petitioners to electronically file petitions. You can eFile your completed petition by following the instructions and user guides available on the Tax Court website at **ustaxcourt.gov/dawson.html**. You will need to register for a DAWSON account to do so. Or you may send the completed petition to:

> United States Tax Court
> 400 Second Street, NW
> Washington, DC 20217

**If you do nothing**
As the partnership representative, if you don't take any action, the FPA becomes final. Unless you file a timely and valid election under IRC Section Code 6226, the partnership must pay any imputed underpayments, penalties, additions to tax or additional amounts determined in this FPA, and any applicable interest.

**How to determine the adjustment year**
Under IRC Section Code 6225(d), if you don't file a petition in relation to IRC Section Code 6234, the "adjustment year" is the partnership's taxable year in which we mailed this Notice of Final Partnership Adjustment. If you file a petition in relation to IRC Section Code 6234, the "adjustment year" will be the partnership's taxable year in which the court makes a final decision on the petition.

**EXHIBIT A**

If you have questions, you can contact the person at the top of this letter. If you write, enclose a copy of this letter and include your telephone number and the best time to call.

Sincerely,

Douglas W. O'Donnell
Acting IRS Commissioner
by
Connie L. Blanford
Technical Services Territory Manager, Legacy

Enclosures:
Form 15027
Form 886-A Explanation of Adjustments

**EXHIBIT A**

# Partnership Summary of Approved Modifications and the Imputed Underpayments

| Audit control number | Tax year ended (mm/dd/yyyy) |
|---|---|
| 1812000746 | 12/31/2018 |

## Partnership Information

| 1. Name | 2. Taxpayer ID Number (TIN) |
|---|---|
| ALAMEDA AGGREGATES LLC | |

| 3. Type of address | ☒ Domestic | ☐ Foreign | | |
|---|---|---|---|---|

| 4a. Street address (including apartment no.) | 4b. City or town | 4c. State or province | 4d. Country code | 4e. ZIP or foreign postal code |
|---|---|---|---|---|
| 4355 COBB PARKWAY, SUITE J 555 | ATLANTA | GA | United States Of America | 30339-4657 |

## Person with Whom the Changes Were Discussed

| 1a. First name | 1b. Middle name | 1c. Last name |
|---|---|---|
| MICHEL | | STEIN |

## Part I - Summary of Approved Modifications

| | (a) General IU Adjustments | (b) Specific IU (1) Adjustments | (c) Specific IU (2) Adjustments | (d) Net Negative Adjustments | (e) Rate |
|---|---|---|---|---|---|
| **Requested Modifications** | | | | | |
| | | | | | |
| a. Partner: | | | | | % |
| Total | | | | | |

**Modification of the Number & Composition of Imputed Underpayments**

| | (a) General IU Adjustments | (b) Specific IU (1) Adjustments | (c) Specific IU (2) Adjustments | (d) Net Negative Adjustments | (e) Rate | (f) Disallowance Code |
|---|---|---|---|---|---|---|
| **Disallowed Modifications & Adjustments to Requested Modifications** | | | | | | |
| a. | | | | | | |
| i. Adjustment: | | | | | | |
| Total | | | | | | |

**Modification of the Applicable Highest Tax Rate Under IRC §6225(c)(4)**

| | (a) General IU Adjustments | (b) Specific IU (1) Adjustments | (c) Specific IU (2) Adjustments | (d) Net Negative Adjustments | (e) Rate |
|---|---|---|---|---|---|
| **Approved Modifications** | | | | | |
| a. Partner: | | | | | % |
| i. Adjustment subject to modified rate: | | | | | % |
| Total | | | | | |

Disallowance code information

Form **15027** (Rev. 8-2020)     Catalog Number 70512V     publish.no.irs.gov     Department of the Treasury - Internal Revenue Service

**EXHIBIT A**

| Name of partnership | Taxpayer ID Number (TIN) | Tax year ended | Audit control number |
|---|---|---|---|
| ALAMEDA AGGREGATES LLC | | 12/31/2018 | 1812000746 |

## Part II - Imputed Underpayment Calculation

| | (1) Reallocation & Residual Grouping (net positive adjustments only) | | | (2) Creditable Expenditures Grouping (net positive adjustments only) | | | (3) Credit Grouping Adjustments | | | (4) Imputed Underpayment(s) | | | (5) Net Negative Adjustments | (6) Penalties | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (a) General IU Adjustments | (b) Specific IU (1) Adjustments | (c) Specific IU (2) Adjustments | (a) General IU Adjustments | (b) Specific IU (1) Adjustments | (c) Specific IU (2) Adjustments | (a) General IU Adjustments | (b) Specific IU (1) Adjustments | (c) Specific IU (2) Adjustments | (a) General IU | (b) Specific IU (1) | (c) Specific IU (2) | | (a) General IU | (b) Specific IU (1) | (c) Specific IU (2) |
| **Adjustments Per Form 14792** | | | | | | | | | | | | | | | | |
| **Reallocation Grouping** | | | | | | | | | | | | | | | | |
| Subgroup: | | | | | | | | | | | | | | | | |
| Subgroup: | | | | | | | | | | | | | | | | |
| Subgroup: | | | | | | | | | | | | | | | | |
| **Residual Grouping** | | | | | | | | | | | | | | | | |
| Subgroup: Sub.K - Noncash contributions (50%) (Code C) | 52,850,000 | | | | | | | | | | | | | | | |
| Subgroup: | | | | | | | | | | | | | | | | |
| 1. Total Adjustments (For each column 1a, 1b and 1c, enter the sum of all amounts listed above Line 1) | 52,850,000 | | | | | | | | | | | | | | | |
| **Creditable Expenditures Grouping** | | | | | | | | | | | | | | | | |
| Subgroup: | | | | | | | | | | | | | | | | |
| Subgroup: | | | | | | | | | | | | | | | | |
| Subgroup: | | | | | | | | | | | | | | | | |
| **Credit Grouping** | | | | | | | | | | | | | | | | |
| Subgroup: | | | | | | | | | | | | | | | | |
| Subgroup: | | | | | | | | | | | | | | | | |
| Subgroup: | | | | | | | | | | | | | | | | |
| 1a. Imputed Underpayment Summary Amounts    Tax rate 37% | | | | | | | | | | 19,554,500 | | | 14,665,875 | | | |
| **Modifications (Approved Modifications from Part I)** | | | | | | | | | | | | | | | | |
| 2. Amended Returns & Alternative Procedures of Partners | | | | | | | | | | | | | | | | |
| 3. Tax-Exempt Partners | | | | | | | | | | | | | | | | |
| 4. Passive Activity Losses of Publicly-traded Partnerships | | | | | | | | | | | | | | | | |
| 5. Qualified Investment Entity Partners | | | | | | | | | | | | | | | | |
| 6. Partner Closing Agreements | | | | | | | | | | | | | | | | |
| 7a. Foreign Partners: Tax treaty claims & statutory exemptions other than §501(a) | | | | | | | | | | | | | | | | |
| 7b. Other Modifications | | | | | | | | | | | | | | | | |
| 8. Number and Composition of the Imputed Underpayments | | | | | | | | | | | | | | | | |
| 9a. Total modifications other than tax rate modifications (Sum of Line 2 through Line 8) | | | | | | | | | | | | | | | | |
| 9b. Total Partnership Adjustments subject to approved rate modification. (Enter amounts from Rate Modifications Schedule, Line 4, columns 1(a), (b) and (c)) | | | | | | | | | | | | | | | | |
| 9c. Sum of Line 9a and Line 9b | | | | | | | | | | | | | | | | |

**EXHIBIT A**

| Name of partnership | | | | | | | | | Taxpayer ID Number (TIN) | | | Tax year ended | | | Audit control number | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALAMEDA AGGREGATES LLC | | | | | | | | | | | | 12/31/2018 | | | 1812000746 | | |

| | (1) Realization & Residual Grouping (net positive adjustments only) | | | (2) Creditable Expenditures Grouping (net positive adjustments only) | | | (3) Credit Grouping Adjustments | | | (4) Imputed Underpayment(s) | | | (5) Net Negative Adjustments | (6) Penalties | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (a) General IU Adjustments | (b) Specific IU (1) Adjustments | (c) Specific IU (2) Adjustments | (a) General IU Adjustments | (b) Specific IU (1) Adjustments | (c) Specific IU (2) Adjustments | (a) General IU Adjustments | (b) Specific IU (1) Adjustments | (c) Specific IU (2) Adjustments | (a) General IU | (b) Specific IU (1) | (c) Specific IU (2) | | (a) General IU | (b) Specific IU (1) | (c) Specific IU (2) |
| **10.** Total Partnership Adjustments not subject to rate modification (For Column 1: Enter the result of Line 1 minus Line 9c. For Column 2, 3 & 5: Enter the result of Line 1a minus Line 9a) | 52,830,000 | | | | | | | | | | | | | | | |
| **11.** Total Netted Partnership Adjustment (Column 1: Multiply each amount on Line 10, column 1(a), (b), (c) by the highest tax rate in effect. Enter each resulting amount on Line 11, column 1(a), (b), (c)) | 19,554,500 | | | | | | | | | | | | | | | |
| **12.** Rate-Modified Netted Partnership Adjustment (Enter in Column 1 (a), (b) and (c), the amounts from the Rate Modifications Schedule, Line 5, column 2(a), (b) and (c)) | | | | | | | | | | | | | | | | |
| **13.** Imputed Underpayment Before Creditable Expenditures & Credits (For each Columns 1a, 1b and 1c, enter the sum of Line 11 and 12) | 19,554,500 | | | | | | | | | 19,554,500 | | | | | | |
| **14.** Net Positive Creditable Expenditure Adjustments (as modified) & Net Credit Adjustments (as modified) which were included in the Imputed Underpayment (Column 2: Enter the amount from Line 10, Column 2; Column 3: Enter the amount from Line 10, Column 3) | | | | | | | | | | | | | | | | |
| **15.** Imputed Underpayments (Column 4(a): Enter the sum of Line 13, column 1(a), Line 14, column 2a, and Line 14, column 3a. Column 4(b): Enter the sum of Line 13, column 1(b), Line 14, column 2(b), and Line 14, column 3(b). Column 4(c): Enter the sum of Line 13, column 1(c), Line 14, column 2(c), and Line 14, column 3 | | | | | | | | | | | | | | | | |
| **16.** Penalties | | | | | | | | | | | | | | | | |
| **a.** Penalty description & code section: 6663 - Civil Fraud | | | | | | | | | | | | | | 14,665,875 | | |
| **17.** Total Penalties with respect to the Imputed Underpayment | | | | | | | | | | | | | | 14,665,875 | | |
| **18.** Estimated interest | | | | | | | | | | | | | | | | |

Interest (IRC § 6233(a)(2)) - estimated and computed to (mm/dd/yyyy)  4.4.2023   Amount of estimated interest  6,568,505.41

Other information

## Part III - Rate Modifications Schedule

**EXHIBIT A**

| Name of partnership | Taxpayer ID Number (TIN) | Tax year ended | Audit control number |
|---|---|---|---|
| ALAMEDA AGGREGATES LLC | | 12/31/2018 | 1812000746 |

| | Realization & Residual Grouping Adjustments Subject to Rate Modification (positive adjustments only) (1) | | | Rate-Modified Adjustments (2) | | |
|---|---|---|---|---|---|---|
| | (a) General IU Adjustments | (b) Specific IU (1) Adjustments | (c) Specific IU (2) Adjustments | (a) General IU | (b) Specific IU (1) | (c) Specific IU (2) |

Adjustments Subject to Rate Modification. (Column 1: List the total amounts on Line 1 through 3 which are adjustments (or portions thereof) subject to rate reduction. Column 2: For each amount listed in column 1, Line 1 through 3, multiply by the tax rate listed per line, and enter the result in column 2)

| | Amounts Subject to Rate Modification | | | Rate-Modified Adjustments | | |
|---|---|---|---|---|---|---|

| | Realization & Residual Grouping Adjustments Subject to Rate Modification (positive adjustments only) (1) | | | Rate-Modified Adjustments (2) | | |
|---|---|---|---|---|---|---|
| | (a) General IU Adjustments | (b) Specific IU (1) Adjustments | (c) Specific IU (2) Adjustments | (a) General IU | (b) Specific IU (1) | (c) Specific IU (2) |

Adjustments Subject to Rate Modification. (Column 1: List the total amounts on Line 1 through 3 which are adjustments (or portions thereof) subject to rate reduction. Column 2: For each amount listed in column 1, Line 1 through 3, multiply by the tax rate listed per line, and enter the result in column 2)

| | Amounts Subject to Rate Modification | | | Rate-Modified Adjustments | | |
|---|---|---|---|---|---|---|

1. Total amount subject to highest capital gains rate _____ %

2. Total amount subject to highest corporate rate _____ %

3. Amounts subject to other rates (including rate reductions under foreign partner tax treaty claims)

a. Other rate:

b. Other rate:

c. Other rate:

4. Total Partnership Adjustments subject to approved rate reduction (Enter in Column 2 (Enter the sum of Line 1 through 3. Also enter this amount on Part II, line 9b, column 1(a),1(b) and 1(c))

5. Rate-Modified Netted Partnership Adjustment (Enter in Column 2 (a), 2(a)and 2(c) (the sum of Column 2, Lines 1 through 3. Also, enter these amounts on Part II, Line 12, column 1(a), 1(b) and 1(c))

EXHIBIT A

Name of partnership

ALAMEDA AGGREGATES LLC

| Taxpayer ID Number (TIN) | Tax year ended | Audit control number |
|---|---|---|
| [redacted] | 12/31/2018 | 1812000746 |

## Offer of Agreement to Partnership Imputed Underpayments and Partnership Level Determinations as to Penalties, Additions to Tax and Additional Amounts & Waiver of Restrictions on Assessment for Imputed Underpayments, Penalties, Additions to Tax and Additional Amounts

By signing this offer of agreement, it is understood that the partnership and the partnership representative agree to the following:

- The partnership accepts the adjustments, modifications, and other amounts on this form;
- The partnership will not be able to contest any of the amounts in any court;
- The partnership representative is binding the partners to the amounts;
- Neither the partnership nor the partnership representative will be able to exercise appeal rights with the Internal Revenue Service with respect to the amounts;
- Neither the partnership nor any of the partners may file claims for refund, credit or any request for change to the amounts; and
- The partnership will take into account adjustments that do not result in an imputed underpayment in the adjustment year in accordance with section 6225 (a)(2) of the Internal Revenue Code (IRC) unless an election is made under section 6226.

By signing this agreement, the partnership also waives the limitations under section 6232(b) and consents to the assessment and collection of any imputed underpayment, penalty, addition to tax, or additional amounts plus interest as provided by law unless an election is made under section 6226.

This agreement is conditional and will not become effective or final until this agreement form is returned to the Commissioner and is signed on his or her behalf.

| Signature of individual partnership representative or designated individual *(see instructions)* | Date | Telephone number |
|---|---|---|
| | | |

Title

| Name of person signing the form | Name of entity partnership representative *(if applicable)* |
|---|---|
| | |

## For Internal Revenue Use Only

| Date accepted for Commissioner | Signature | |
|---|---|---|
| | | |

| Office | | Title |
|---|---|---|
| | | |

## Instructions for Signing Form 15027

This form must be signed by the partnership representative who has the sole authority to act on behalf of the partnership.

**If you are an individual partnership representative, sign the form and enter the information as requested:**
- Your name, date, and telephone number.

**If you are a designated individual, sign the form and enter the information as requested:**
- Your name, date, and telephone number.
- Name of entity partnership representative.

**EXHIBIT A**

## Residual Grouping F15027:

## Subgroup: Sch K - Noncash contributions (50%) (Code C)

1. The Noncash Contributions (Conservation Easement) of $52,850,000.00 that you reported on Form 1065 for the tax year ended December 31, 2018 is disallowed because you have not shown you made such a contribution, you have not shown that you satisfied the requirements of IRC section 170 and the corresponding Treasury Regulations, you have not shown that the value of any contribution is greater than zero, and you have not shown that the transaction, as structured, should be respected for Federal income tax purposes.

2. Alternatively, the allowable Noncash Contribution (Conservation Easement) amount is limited to $405,000.00, as explained in the Summary Report.

## Penalties F15027:

1. A 75% Civil Fraud penalty under section 6663(a) applies to the entire amount of underpayment of tax attributable to the adjustment of $52,850,000.00.

| Deductions to which Penalty 1 applies | $52,850,000 |
| --- | --- |
| Highest rate for the taxable year (higher of IRC 1 or 11) | 37.00% |
| Imputed Underpayment associates with these Adjustments | $19,554,500 |
| Civil Fraud Penalty Rate | 75% |
| Civil Fraud Penalty | $14,665,875 |

2. To the extent the civil fraud penalty is not sustained, a 40% gross valuation misstatement (section 6662(h)), or alternatively a 20% substantial valuation misstatement penalty (section 6662(e)), applies to the imputed underpayment that results from claiming the deduction in excess of the correct amount. In addition, a 20% reportable transaction penalty (section 6662A) applies to the portion of the understatement to which the valuation misstatement penalty does not apply. As an alternative to the reportable transaction penalty, an additional 20% penalty applies to the amount of the imputed underpayment to which the valuation misstatement penalty does not apply, and which is attributable to negligence or disregard of rules or regulations (section 6662(a)) or a substantial understatement of income tax (section

**EXHIBIT A**

6662(d)).

3. Alternatively, if the valuation misstatement penalty is not sustained, a 20% reportable transaction penalty (section 6662A) applies to the entire amount of any understatement of tax attributable to a reportable transaction.

4. Alternatively, if the valuation misstatement and reportable transaction penalties are not sustained, a 20% penalty applies to the entire amount of any underpayment attributable to negligence or disregard of rules or regulations (section 6662(a)) or a substantial understatement of income tax (section 6662(d)).

**The following pertains to the calculation of the imputed underpayment in accordance with I.R.C. Section 6225 and its corresponding regulations.**

Imputed Underpayment Computation:

| | |
|---|---|
| Residual Grouping | |
| Noncash Contributions | $52,850,000 |
| | |
| Sum of all net positive Residual Grouping Adjustments | $52,850,000 |
| | |
| Total Net Positive Adjustment (TNPA) | $52,850,000 |
| Highest Rate for the Taxable Year | 37% |
| Imputed Underpayment before Credit and Creditable Expenditures | $19,554,500 |
| | |
| Imputed Underpayment | $19,554,500 |
| Penalties | $14,665,875 |

**EXHIBIT A**